FILED

Jun 14   12 51 PM '04

U. S. DISTRICT COURT

**UNITED STATES DISTRICT COURT** FEN, CONN
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| RICHARD KUHN, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | NO. 3:02CV363 (EBB) |
| | : | |
| COMPUTER SCIENCE CORPORATION, | : | |
| | : | |
| Defendant. | : | JUNE 14, 2004 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and the Local Rules of this

Court, the defendant, Computer Sciences Corporation ("CSC"), respectfully submits this

Memorandum of Law in Support of its Motion for Summary Judgment on Counts One Two, Four,

Five and Eight of plaintiff's Complaint.  In substance, those counts allege age discrimination and

retaliation under federal and state law.  Notwithstanding his conclusory allegations, plaintiff has

presented no evidence that the reason CSC laid him off on March 30, 2001 was because of his age.

Indeed, aside from his unsupported allegation that CSC filled his position with a younger

employee, plaintiff admits that he has no facts to support his allegations of age discrimination.

Moreover, the evidence developed in discovery reveals indisputably that CSC experienced a

downturn in business, implemented a reduction in force, and selected plaintiff for layoff because of

his poor performance.

## I.    **INTRODUCTION**

This is an action for money damages brought pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 et seq., as well as state antidiscrimination statutes, and claims for overtime compensation.[1] The plaintiff, Richard Kuhn, (hereinafter "Kuhn" or "Plaintiff"), is a former Member of Technical Staff A for CSC in Stratford, Connecticut. He worked for CSC from January 1, 2000 until his layoff on March 30, 2001. Plaintiff was 61 years old at the time CSC hired him and 63 years old at the time of his layoff.

When CSC first hired plaintiff, he worked as a Desktop Technician, responsible for diagnosing and correcting computer problems. Throughout his brief employment, plaintiff worked on-site at Sikorsky Aircraft Corporation ("Sikorsky"), which is one of CSC's clients in Stratford, Connecticut. In or about March 2000, Plaintiff assumed duties as an ICMS Queue Administrator, although his salary and benefits did not change. As an ICMS Queue Administrator, he was responsible for handling the workflow of computer-related issues of Sikorsky employees and distributing work to CSC Desktop Technicians, where appropriate. Plaintiff reported to CSC's desktop manager, Fred Chavez, from May 2000 until his layoff on March 30, 2001.

During plaintiff's tenure at CSC, Chavez was repeatedly dissatisfied with plaintiff's performance, and continually modified his job duties based on the best interests of the client, and

---

[1] Although CSC maintains that plaintiff's claims for overtime compensation are meritless, CSC does not seek summary judgment on those claims at this time.

in an effort to find plaintiff a job in which he would be successful. Ultimately, as a result of a

business downturn, CSC underwent a reduction in force in March 2001. Chavez recommended

plaintiff for layoff based on his history of poor performance.

Plaintiff claims that CSC terminated his employment because of his age and in retaliation

for allegedly opposing age-discriminatory practices. He further claims that changes CSC made to

his job duties during his employment were motivated by age-discriminatory animus. Notably,

however, aside from his unsupported allegation that CSC filled his position with a younger

employee, plaintiff admits that he has no facts to support his claims of age discrimination.

Because plaintiff cannot set forth any genuine issues of material fact, and because the undisputed

evidence demonstrates that CSC's treatment of plaintiff was at all times legal and appropriate,

CSC is entitled to judgment as a matter of law. CSC therefore respectfully requests that this Court

grant its Motion for Summary Judgment.

## II.    FACTS[2]

### A.    Plaintiff's Job Duties

Plaintiff became a Sikorsky employee in 1991, working in its information technology

("IT") department. (Deposition of Richard Kuhn ("Kuhn Dep.") at 22-23.)[3] In 2000, Sikorsky

---

[2] For purposes of this Motion for Summary Judgment only, the defendant accepts as true the facts as plaintiff has recited them in his Complaint and during discovery.

[3] Portions of Mr. Kuhn's deposition transcript cited herein are attached as Exhibit A.

-3-

outsourced its IT operations to CSC.  (Id.)  In connection with that outsourcing, on January 1, 2000, CSC hired IT employees from Sikorsky, including plaintiff.  (Kuhn Dep. at 22-23.) Although originally hired as a Desktop Technician, plaintiff assumed duties as an ICMS Queue Administrator in March 2000, with no change to his salary or benefits.  (Id. at 27.)  In or about May 2000, plaintiff began reporting to Fred Chavez, the Desktop Manager.  (Id. at 24.)

CSC employed two kinds of Desktop Technicians:  ICMS technicians and Problem Resolution Technicians.  ICMS technicians conduct installations, changes, moves and surplus ("ICMS") of computers and peripheral devices.  (Affidavit of Fred Chavez of 6/9/04 ("Chavez Aff."), ¶ 5, attached as Exhibit B.)   Problem resolution technicians address and resolve problems the customer is having with an existing computer.  (Id. at ¶ 5.)

As an ICMS Queue Administrator, plaintiff was responsible for handling the workflow of ICMS technicians.  (Kuhn Dep. at 28.)  Plaintiff testified that, in addition to performing functions as an ICMS Queue Administrator, he also acted as a Problem Resolution Queue Administrator, handling the workflow of problem resolution technicians.  (Kuhn Dep. at 32.)  The duties of the two positions overlap in the sense that both roles are intended to manage workflow in essentially the same manner.  As plaintiff put it in a self-evaluation, he was "responsible for monitoring all of the calls that are log [sic] at the help desk; and to see that they are assigned, resolved and closed in a respectable time frame."  (Plaintiff's Performance Appraisal of 3/31/00, attached as Exhibit C.)

-4-

The process worked as follows: First, the client (i.e., a Sikorsky employee) would call regarding a computer-related problem or task. (Kuhn Dep. at 33, 52.) CSC personnel would record the problem or task in an electronic "ticket"[4] and, if they were unable to address it over the phone, they would transfer the ticket electronically to plaintiff, as the Queue Administrator. (Id. at 51-53.) Plaintiff's first task was to speak directly with the customer in an attempt to diagnose and resolve the problem over the phone. (Id. at 34, 53.) This would minimize or obviate the need to occupy a Desktop Technician's time, and afford Desktop Technicians sufficient time to deal with more complicated computer issues that required additional attention. (See id. at 34.) If plaintiff was unable to resolve a problem over the phone, he assigned the ticket to a Desktop Technician. (Id. at 53.) His responsibilities, however, did not stop there. Plaintiff was responsible for updating the status of each ticket and ensuring that the work on all tickets was completed by the Desktop Technicians. (Id. at 74, 96.) Plaintiff's duties as ICMS Queue Administrator and Problem Resolution Queue Administrator were further detailed in CSC's list of Roles and Responsibilities, which he admits he received. (Id. at 46; Roles and Responsibilities of ICMS Queue Administrator, ¶ 3.1.3.2, attached as Exhibit E.)

---

[4] The term "ticket" was associated exclusively with problem resolution issues. To resolve an ICMS issue, the client would submit a "service request" rather than a "ticket." (Deposition of Fred Chavez ("Chavez Dep.") at 107, portions attached as Exhibit D.) In substance, both a "ticket" and a "service request" serve the same purpose: to alert CSC to a problem/task that it must address.

After the Desktop Technicians completed assigned work, they were required to complete Property Work Order forms ("PWO's"), which contained information about the work performed. (Chavez Aff., ¶ 6.)  Plaintiff was responsible for collecting PWO's from the technicians, ensuring the accuracy and completeness of the information contained on the forms, completing any missing information and sending the PWO's to CSC's "back office," which is responsible for maintaining those records.  (Chavez Aff., ¶ 7.)

B.     Problems With Plaintiff's Performance

Chavez became the Desktop Manager, and plaintiff's supervisor, in May 2000.  (Chavez Aff., ¶¶ 3-4.)  Shortly thereafter, plaintiff's performance problems became readily apparent to Chavez.  For example, in June 2000, on more than one occasion CSC's back office had to send numerous incomplete PWO's back to plaintiff for his completion because he did not complete the information in the first instance, as he was supposed to do.  (See E-mails from B. Ahuja to R. Gaynor of 6/9/00 and 6/15/00, attached as Exhibit F.)  First, on June 9, 2000, Brij Ahuja, the back office activity coordinator at CSC, sent an e-mail to Rob Gaynor, a CSC Service Delivery Manager, indicating that, out of 382 PWO's he had received, 128 were incomplete and had been "sent back to Dick Kuhn by overnight FedEx to complete the missing information." (Exhibit F at 2.)  Subsequently, on June 15, 2000, Ahuja sent a second e-mail to Gaynor, indicating that he was sending back for completion another 86 incomplete PWO's.  (Id. at 1.)  Ahuja also pointed out that "[a]ny incomplete PWO is a revenue loss to CSC because client can not be invoiced for the service

-6-

and asset data can not be updated, which will mess up the technology refresh and asset management activity." (Id. at 2.) Thus, plaintiff's inattentiveness to detail and the incompleteness of his work became apparent shortly after Chavez became the Desktop Manager.

During the last two weeks in July, plaintiff took a vacation. Because he had arranged this vacation before Chavez became the Desktop Manager, Chavez was unaware that plaintiff was going on vacation until just days beforehand. (Chavez Aff., ¶ 8.) When he found out about plaintiff's plan to take a two-week vacation, Chavez assigned Eric Anderson to perform the ICMS Queue Administrator duties during that period. (Chavez Aff., ¶ 9; Kuhn Dep. at 95.)

When Anderson began to perform the ICMS Queue Administrator duties, Chavez discovered that plaintiff's performance in that capacity was inefficient and substandard. (Chavez Aff., ¶ 10.) Anderson brought to Chavez's attention a large backlog of tickets that plaintiff had not yet addressed. (Chavez Aff., ¶ 10.) During plaintiff's two-week absence, Chavez noticed that Anderson performed the ICMS Queue Administrator position effectively, and that he had successfully decreased some of the ticket backlog plaintiff had failed to address before his vacation.[5] (Chavez Aff., ¶ 12.) In light of plaintiff's difficulties in performing the ICMS Queue Administrator function, and the competence with which Anderson did the job, Chavez assigned Anderson to the ICMS Queue Administrator position, and gave plaintiff a different job. (Chavez

---

[5] Plaintiff admitted at his deposition that he did not know whether or not Anderson performed the Queue Administrator responsibilities well. (Kuhn Dep. at 95.)

Aff., ¶ 11.) Plaintiff testified that, after he returned from vacation, CSC had assigned him to Desktop Technician tasks such as installing and surplusing (disassembling) computer systems. (Kuhn Dep. at 30, 94, 97.)

Nonetheless, plaintiff wanted to be the ICMS Queue Administrator. Accordingly, in or about mid-August 2000, plaintiff attended a meeting with Chavez, Gaynor, Anderson and others from CSC. (Kuhn Dep. at 117.) At that meeting, Chavez and/or Gaynor told plaintiff that they would further assist and teach plaintiff to help him succeed at CSC as Queue Administrator. (See Kuhn Dep. at 119-20.) They also told plaintiff that he needed to work 8 a.m. to 5 p.m. because that was when most of the ICMS work came in from the customer. (Kuhn Dep. at 123.) Plaintiff agreed to work those hours. (Id.)

Plaintiff's poor performance, however, continued thereafter. For example, on August 24, 2000, Jerald Walker, a desktop technician, sent an e-mail to Derek Heard and Fred Chavez informing them of a problem caused by plaintiff's failure to update the status of a ticket. (E-mails to and from J. Walker of 8/24/00, attached as Exhibit G.) Walker had taken care of two tickets assigned to him by plaintiff. Walker then left a voice mail message for plaintiff that afternoon regarding the completion of the job. Because plaintiff subsequently failed to update the status of the ticket in the computer, another technician was unaware that Walker had already addressed that ticket, and duplicated Walker's efforts. (Exhibit G.) Consistent with Walker's e-mail, plaintiff admitted at his deposition that he did not always record the entire status of a job in a ticket, even

-8-

though it was his job to do so, and even though such status information is helpful to avoid duplication of efforts. (See Kuhn Dep. at 139-40, 147-48.)

Plaintiff was also inept at assigning tickets to Desktop Technicians in a timely fashion. Sikorsky's contract with CSC required CSC to address tickets within a specified timeframe. (See Kuhn Dep. at 178.) Accordingly, timely assignment of tickets by the Queue Administrator to the Desktop Technicians was essential. At plaintiff's deposition, counsel for CSC showed plaintiff various records of old tickets that plaintiff had failed to assign to a technician for hours, and sometimes days. (See Ticket Records, Bates Nos. CSC0023-0025, attached as Exhibit H; see also Kuhn Dep. at 142-45.) Plaintiff was unable to explain why these tickets were days old.[6] (Kuhn Dep. at 145.)

Sometime after the meeting in mid-August between plaintiff and other CSC personnel, plaintiff informed Chavez that he could not, after all, work 8 a.m. to 5 p.m. five days a week (as he had previously agreed to do) because he needed to pick his daughter up at school in the afternoon. (Kuhn Dep. at 125-26.) Accordingly, Chavez allowed plaintiff to work 8 a.m. to 5 p.m. on Mondays, Wednesdays and Fridays, and 6:30 a.m. to 3:30 p.m. on Tuesdays and

_____

[6] Plaintiff testified that he "didn't like assigning more than five [tickets] per man," and speculated that, if each of the technicians was handling five tickets at that point in time, that could have been why there were a number of unassigned tickets in his queue. (Kuhn Dep. at 143.) Notably, plaintiff's supervisor never instructed him to institute such a practice. (Id.) In any event, however, plaintiff was unable to remember these particular tickets, (id. at 145), and accordingly could not confirm the reason that he withheld the tickets in his queue.

Thursdays. (Kuhn Dep. at 125-26.) Ultimately, this flexible schedule was also inconvenient for plaintiff, and his working hours reverted back to 6:30 a.m. to 3:30 p.m. five days a week. (Kuhn Dep. at 127.)

Due to the repeated performance and scheduling difficulties plaintiff had in performing the ICMS Queue Administrator position, CSC modified his job responsibilities once again. Plaintiff began working part-time as Problem Resolution Queue Administrator between 6:30 a.m. and 9 a.m. each day. (Id. at 127-28.) Beginning at 9 a.m., Eric Anderson performed the Queue Administrator duties and plaintiff performed Desktop Technician duties. (Id. at 32-33.)

Ultimately, however, it was apparent that plaintiff lacked sufficient technical knowledge even to handle relatively simple ticket issues via telephone. Indeed, on at least one occasion, plaintiff unsuccessfully tried to assist a user with a problem over the telephone, and assigned the ticket to a Desktop Technician. Notably, the technician was able to solve the problem over the phone simply by "ask[ing] customer to power off and on couple times and that fixed it." (Ticket 238195, Bates No. CSC0028, attached as Exhibit I.) Plaintiff testified that he did not remember why he was unable to resolve the problem over the phone. (Kuhn Dep. at 155.)

In or about January 2001, Chavez began preparing Performance Appraisals for all of his direct reports. (Chavez Aff., ¶ 13.) Although Kuhn did not receive a copy of the final Performance Appraisal because his layoff occurred before appraisals were distributed, (Chavez Aff., ¶ 13), Kuhn had done his self-evaluation, as reflected in Section I of the appraisal.

-10-

(Performance Appraisal, attached as Exhibit J.)  Notably, he did not identify any "Significant

Accomplishments" for the year.  (Exhibit J, at 1.)  Moreover, Chavez's appraisal of Kuhn was

consistent with Kuhn's poor performance throughout the year, as Chavez gave Kuhn an overall

performance rating of "Needs Improvement."  (Exhibit J, at 7.)  Chavez noted that Kuhn displayed

"inadequate problem solving skills" and failed effectively to "organize his or other technicians'

work."  (Exhibit J, at 3.)  Chavez also indicated that Kuhn's "poor attitude and lack of ownership

in his tickets has caused unacceptable delays" for many customers, and that Chavez "can not rely

on him to complete the work on time."  (Exhibit J, at 4-5.)  With specific regard to ticket closures,

Chavez indicated that Kuhn "doesn't put forth the effort to explain the pertinent information…and

the team often must go back to [him] to have him explain what happened on a call.  (Exhibit J, at

4.)  Chavez concluded that, "[g]iven [Kuhn's] inadequate performance CSC will implement a

Performance Improvement Plan to address the issues noted above."  (Exhibit J, at 6.)

     C.    The Layoff Decision

     CSC never implemented a Performance Improvement Plan for Kuhn because, shortly after

Chavez prepared the Performance Appraisal, CSC, faced with a significant downturn in business,

initiated layoffs.  Specifically, CSC had experienced "disappointing fiscal year fourth quarter

earnings," resulting from decreased demand for some of CSC's information technology services.

(Memo from Mary Jo Morris, President of CSC's Technology Management Group ("TMG"), to

TMG Employees of 4/2/01, attached as Exhibit K.)  As a result, CSC took a number of actions to

reduce costs, including reductions in travel and entertainment, use of consultants and contract labor, frozen internal capital expenditures and a reduction in workforce of about five percent. (Exhibit K.) Plaintiff was among the CSC employees affected by the reduction in force. (Letter from G. Siekierka to R. Kuhn of 3/30/01, attached as Exhibit L.)

Plaintiff's selection for layoff was the result of careful consideration by management. Mary Elomaa, a Service Delivery Manager for CSC, was responsible for presenting to Henning Kerger, Vice President of Global Infrastructure Services, a final list of employees to be laid off. (Affidavit of Mary Elomaa of 6/13/01 ("Elomaa Aff."), ¶ 4, attached as Exhibit M.) Because Ms. Elomaa did not directly oversee Kuhn or the other layoff candidates, she relied on the judgment of six managers who reported to her, including Fred Chavez. (Elomaa Aff., ¶ 5.) Elomaa requested that Chavez rank his direct reports based on the quality of their performance. (Chavez Dep. at 179.) Chavez ranked Kuhn last among his 17 direct reports because "[h]e didn't have the technical skill to handle the more complex problems. Didn't show the initiative. I couldn't rely—I felt that I couldn't rely on him to get tasks—well, I had assigned him tasks as a que[ue] coordinator, and they weren't done. I felt that I couldn't rely on him to get tasks done. He didn't seem interested in completing the work to the best of his ability." (Chavez Dep. at 180; Chavez Aff., ¶ 16.)

Based on Chavez's rankings, Elomaa consulted with Joe Anastasio, Senior Member of Professional Staff, and Rich Taylor, Director of Human Resources. (Elomaa Aff., ¶ 7.) Thereafter, Elomaa submitted the final layoff list to Donald Crist, the Service Delivery Director,

-12-

reduce costs, including reductions in travel and entertainment, use of consultants and contract labor, frozen internal capital expenditures and a reduction in workforce of about five percent. (Exhibit K.) Plaintiff was among the CSC employees affected by the reduction in force. (Letter from G. Siekierka to R. Kuhn of 3/30/01, attached as Exhibit L.)

Plaintiff's selection for layoff was the result of careful consideration by management. Mary Elomaa, a Service Delivery Manager for CSC, was responsible for presenting to Henning Kerger, Vice President of Global Infrastructure Services, a final list of employees to be laid off. (Affidavit of Mary Elomaa of 6/9/04 ("Elomaa Aff."), ¶ 4, attached as Exhibit M.) Because Ms. Elomaa did not directly oversee Kuhn or the other layoff candidates, she relied on the judgment of six managers who reported to her, including Fred Chavez. (Elomaa Aff., ¶ 5.) Elomaa requested that Chavez rank his direct reports based on the quality of their performance. (Chavez Dep. at 179.) Chavez ranked Kuhn last among his 17 direct reports because "[h]e didn't have the technical skill to handle the more complex problems. Didn't show the initiative. I couldn't rely—I felt that I couldn't rely on him to get tasks—well, I had assigned him tasks as a que[ue] coordinator, and they weren't done. I felt that I couldn't rely on him to get tasks done. He didn't seem interested in completing the work to the best of his ability." (Chavez Dep. at 180; Chavez Aff., ¶ 16.)

Based on Chavez's rankings, Elomaa consulted with Joe Anastasio, Senior Member of Professional Staff, and Rich Taylor, Director of Human Resources. (Elomaa Aff., ¶ 7.) Thereafter, Elomaa submitted the final layoff list to Donald Crist, the Service Delivery Director,

-12-

who in turn submitted the list to Henning Kerger. (Elomaa Aff., ¶ 7.) Based on Chavez's

assessment, Kuhn was among those selected for layoff.

D.    Kuhn's CHRO Claims

Kuhn filed two separate age discrimination charges with the Connecticut Commission on

Human Rights and Opportunities ("CHRO"). The first charge, dated August 24, 2000, occurred in

the middle of his employment with CSC, when Chavez reassigned the Queue Administrator

responsibilities from plaintiff to Eric Anderson. Plaintiff filed his second charge following his

layoff. He alleged that CSC selected him for layoff based on his age and because he allegedly

previously opposed discriminatory practices in the workplace. Before the CHRO made any

findings, however, plaintiff withdrew his CHRO charges and filed the present action on February

28, 2002.

Plaintiff's Complaint is in eight counts. Counts One and Four allege age discrimination

under federal and state law, respectively. Counts Two and Five allege retaliation on the part of

CSC under federal and state law for plaintiff's alleged opposition to age discriminatory practices.

Count Eight purports to allege a breach of the covenant of good faith and fair dealing based on

alleged violations of the age discrimination statutes. Counts Three, Six and Seven assert claims

for unpaid overtime compensation; CSC does not seek summary judgment on those counts. CSC

does, however, seek summary judgment on Counts One, Two, Four, Five and Eight.

-13-

## III.  **ARGUMENT**

### A.    **Legal Standard For Summary Judgment**

The Federal Rules of Civil Procedure provide that a party is entitled to summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U. S. 317, 324-25 (1986); <u>Viola v. Philips Medical Sys.</u>, 42 F.3d 712, 716 (2d Cir. 1994).  Accordingly, CSC is entitled to summary judgment unless the plaintiff can set forth "specific facts," supported by admissible evidence, showing that there is a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(e); <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33 (2d Cir. 2000).  "Properly used, summary judgment permits a court to streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litigation."  <u>Knight v. United States Fire Ins. Co.</u>, 804 F.2d 9, 12 (2d Cir. 1986) (citation omitted).  Summary judgment is not a disfavored procedural shortcut, but rather is "an <u>integral</u> <u>part</u> of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  <u>Celotex Corp.</u>, 477 U.S. at 327 (emphasis added) (citations omitted).

The mere existence of alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  A scintilla of evidence in support of the plaintiff's position is insufficient; there must be evidence

-14-

from which a jury reasonably could find for him. Id. at 252. The party opposing the motion must, therefore, demonstrate with admissible evidence that a genuine dispute over material facts actually exists, and cannot rely solely on its pleadings, conclusory statements, or on the "mere hope" that discovery proceedings or a trial will disclose further evidence. Gray v. Town of Darien, 927 F.2d 69, 74 (2d Cir. 1991).

Employment discrimination claims are not immune from summary judgment. The Second Circuit has held that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). In fact, as the Second Circuit has noted, "[j]ust a few short years ago we went out of our way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable'." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).

Accordingly, a plaintiff alleging employment discrimination may not rest on "mere allegations" but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The time has come, as James and Hazard put it, 'to put up or shut up.'" Weinstock, 224 F.3d 33, 41 (2d Cir. 2000) (citing Fleming James, Jr. & Geoffrey C. Hazard, Jr., Civil Procedure 150 (2d ed. 1977)). Thus, the plaintiff cannot defeat a motion for summary judgment "by offering purely conclusory allegations of discrimination, absent any concrete particulars...." Meiri, 759 F.2d at 998; see Goenaga v. March of Dimes Birth Defects Found., 51

-15-

F.3d 14, 18 (2d Cir. 1995) (holding that unsupported allegations do not create a material issue of fact).

The United States Supreme Court decision in <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133 (2000) still permits summary judgment in appropriate employment cases. <u>See</u> <u>James v. New York Racing Ass'n</u>, 233 F.3d 149 (2d Cir. 2000). In fact, in <u>Reeves</u>, the court reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'" <u>Id.</u> at 2109 (citation omitted). The <u>Reeves</u> opinion does nothing to alter prevailing law regarding the sufficiency and quantum of evidence required for a plaintiff to have his claim submitted to a jury. <u>See</u> <u>Schnabel v. Abramson</u>, 232 F.3d 83, 90 (2d Cir. 2000) (finding that "We read [Second Circuit law] as consonant with <u>Reeves</u>: Both hold that the quantum of evidence needed to sustain an inference of discrimination is the same as that needed to sustain the ultimate inference in any other civil case."); <u>see also</u> <u>James v. New York Racing Assoc.</u>, 233 F.3d 149, 155 (2d Cir. 2000) (same)

**B.     <u>Kuhn Has Not Produced any Direct Evidence of Age Discrimination.</u>**

"Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions." <u>Bodenheimer v. PPG Indus., Inc.</u>, 5 F.3d 955, 958 (5th Cir. 1993). Plaintiff has offered no direct evidence to support his discrimination claims. He must therefore rely on indirect evidence, and the familiar framework for analyzing such claims.

-16-

**C.    Kuhn Cannot Establish His Age Discrimination Claims Through Indirect Proof (Counts 1 and 4).**

    **1.    Legal Standard for Evaluating Claims under ADEA through Indirect Proof.**

Because there is no direct evidence of discrimination, Kuhn must attempt to prove his case by indirect proof. The Second Circuit has clearly set forth the analytical framework for evaluating these claims of age discrimination.[7] See Schnabel v. Abramson, 232 F.3d 83 (2d Cir. 2000); James v. New York Racing Assoc., 233 F.3d 149 (2d Cir. 2000); Viola v. Philips Medi. Sys., 42 F.3d 712, 715-16 (2d Cir. 1994). In accordance with this analytical framework, the plaintiff has the initial burden of establishing a prima facie case under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), by showing that: (1) he was within the protected age group; (2) he was qualified for his job; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of age discrimination. Id.; Sedotto v. Borg-Warner Protective Services Corp., 94 F.Supp.2d 251, 260 (D. Conn. 2000) (citations omitted); Stetson v. NYNEX Serv. Co., 995 F.2d 355, 359-60 (2d Cir. 1993).

---

[7]    Defendant's analysis of plaintiff's federal age discrimination claim applies equally to the state antidiscrimination claim. "Although the remedies under the federal and state [age discrimination] statutes are somewhat different...the analytical model for proof of discrimination is the same for both statutes, and indeed federal precedent provides guidance for the application of state laws concerning employment discrimination." Duncan v. Junior Achievement, Inc., No. CV-96-0335878S, 2001 Conn. Super. LEXIS 1149, at *2 (Conn. Super. 2001) (citing Levy v. Commission on Human Rights and Opportunities, 236 Conn. 96, 103, 671 A.2d 349 (1996); Miko v. Commission on Human Rights and Opportunities, 220 Conn. 192, 202-03, 596 A.2d 396 (1991)).

If the plaintiff establishes a <u>prima facie</u> case, CSC must proffer a non-discriminatory business rationale for its actions. <u>Viola</u>, 42 F.3d at 716. "To rebut a <u>prima facie</u> case the defendants need only 'produce enough admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'" <u>Graham v. Texasgulf, Inc.</u>, 662 F. Supp. 1451, 1460 (D. Conn. 1987) <u>aff'd mem.</u>, (<u>quoting</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 257 (1981)), 842 F.2d 1287 (2d Cir. 1988). After CSC articulates an age-neutral reason for the termination, "'the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.'" <u>Ortiz v. Prudential Ins. Co.</u>, 94 F.Supp.2d 225, 235 (D. Conn. 2000) (citations omitted). In other words, the plaintiff has the ultimate burden of proving that intentional age discrimination, rather than the explanation offered by the employer, was the real reason for the adverse employment action. <u>Viola</u>, 42 F.3d at 717.

Throughout this three-step analysis, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains <u>at all times</u> with the plaintiff." <u>Schnabel</u>, 232 F.3d at 88 n.2 (citation omitted); <u>see</u> <u>Saulpaugh v. Monroe Community Hosp.</u>, 4 F.3d 134, 142 (2d Cir. 1993) (<u>Hicks</u> "reiterat[es] the longstanding rule that despite shifting burdens of production, a plaintiff <u>always</u> shoulders the ultimate burden of proof." (emphasis added)).

-18-

### 2.    Kuhn Cannot Establish Even a Prima Facie Case of Age Discrimination.

Plaintiff claims that CSC unlawfully discriminated against him based on his age by: (1) relieving him of his responsibilities as ICMS Queue Administrator; (2) subsequently laying him off on March 30, 2001; and (3) refusing to hire him for other positions for which he allegedly applied while still as CSC employee. Plaintiff cannot establish even a prima facie case of age discrimination because he cannot prove that he was qualified for his job.[8]

In light of his consistently poor performance, plaintiff cannot show that he was qualified to be a Queue Administrator. He submitted numerous incomplete PWO's to CSC's back office because he failed to complete the necessary information in the first instance. (See E-mails from B. Ahuja to R. Gaynor of 6/9/00 and 6/15/00, Exhibit F.) He accumulated a large backlog of tickets

---

[8] For limited purposes of this Motion only, CSC does not challenge plaintiff's ability to satisfy the fourth prong of the McDonnell Douglas prima facie analysis. Recognizing that the ultimate inquiry is whether a plaintiff has presented sufficient evidence from which a reasonable juror could conclude that the real reason for the adverse employment action was the employee's age, some courts now presume that a plaintiff has satisfied the burden of setting forth a prima facie case in addressing a defendant's motion for summary judgment. See Lapsley v. Columbia Univ.- College of Physicians, 999 F. Supp. 506, 515 (S.D.N.Y. 1998) (citations omitted). Courts in this circuit have held that replacement by a younger worker is generally sufficient to satisfy the fourth prong of the prima facie analysis and give rise to an initial inference of age discrimination. See Strohmeyer v. Int'l Bhd. of Painters & Allied Trades, 989 F. Supp. 455, 459 (W.D.N.Y. 1997), aff'd, No. 98-7069, 1998 U.S. App. LEXIS 26002 (2d Cir. N.Y. Oct. 9, 1998). Plaintiff alleges that CSC hired younger employees to replace him. Although CSC denies this allegation, it will assume for purposes of this Motion only that plaintiff can satisfy the fourth prong of the prima facie case. As explained infra, however, plaintiff has no evidence that CSC's legitimate, non-discriminatory business reasons for its decisions constituted pretext for age discrimination.

-19-

that Eric Anderson had to address during plaintiff's vacation. (Chavez Aff., ¶ 10.)   In view of the ticket backlog, it is no surprise to learn that plaintiff failed to assign tickets to Desktop Technicians in a timely fashion, (see Ticket Records, Bates Nos. CSC0023-0025, Exhibit H; see also Kuhn Dep. at 142-45), and failed regularly to update the status of tickets in his queue. (See Kuhn Dep. at 139-40, 147-48.)

Although CSC gave plaintiff repeated opportunities to correct his poor performance, and showed a willingness to be flexible about plaintiff's work schedule in the process, plaintiff's poor performance continued.  Accordingly, in preparing Kuhn's Performance Appraisal, Fred Chavez gave Kuhn an overall performance rating of "Needs Improvement." (Performance Appraisal, Exhibit J, at 7.)  Chavez noted that Kuhn displayed "inadequate problem solving skills" and failed effectively to "organize his or other technicians' work." (Exhibit J, at 3.)  Chavez also indicated that Kuhn's "poor attitude and lack of ownership in his tickets has caused unacceptable delays" for many customers, and that Chavez "can not rely on him to complete the work on time." (Exhibit J, at 4-5.)  With specific regard to ticket closures, Chavez indicated that Kuhn "doesn't put forth the effort to explain the pertinent information…and the team often must go back to [him] to have him explain what happened on a call. (Exhibit J, at 4.)  Notably, in the self-evaluation portion of the Performance Appraisal, Kuhn himself was unable to identify a single "Significant Accomplishment" for the year. (Exhibit J, at 1.)  When asked why he did not identify any

-20-

significant accomplishments, Kuhn acknowledged that he "didn't know what to put there." (Kuhn Dep. at 171-72.)

Because plaintiff cannot show that he was qualified for the Queue Administrator position, he has failed to establish a prima facie case of age discrimination.

### 3. **CSC Has Articulated a Non-discriminatory Legitimate Business Reason for Its Decisions.**

Even if Plaintiff were able to establish a prima facie case of age discrimination, CSC has nevertheless articulated legitimate, non-discriminatory reasons for its business decisions. As to CSC's decision to transfer the Queue Administrator responsibilities to Eric Anderson, CSC based its decision on repeated problems with plaintiff's performance. When Anderson began to perform the ICMS Queue Administrator duties during plaintiff's two-week vacation in July 2000, it became apparent to Fred Chavez that plaintiff's performance in that capacity was inefficient and substandard. (Chavez Aff., ¶ 10.) Moreover, Anderson performed the ICMS Queue Administrator position effectively, and successfully decreased a significant amount of the ticket backlog plaintiff had failed to address before his vacation. (Chavez Aff., ¶ 10.) When plaintiff was unable to prove his ability to perform the Queue Administrator function after repeated opportunities to do so, Chavez made a legitimate and logical business decision to have Anderson perform the Queue Administrator function going forward in light of the competence with which he did the job. (Chavez Aff., ¶ 11.)

-21-

With respect to CSC's subsequent decision to select plaintiff for layoff, CSC had experienced "disappointing fiscal year fourth quarter earnings," resulting from decreased demand for some of its information technology services. (Memo from M. Morris to TMG Employees of 4/2/01, Exhibit K.) One of the actions CSC took to reduce costs was to reduce its workforce by about five percent. (Exhibit K.) Specifically, Mary Elomaa, a Service Delivery Manager for CSC, was responsible for presenting to Henning Kerger, Vice President of Global Infrastructure Services, a final list of employees to be laid off. (Elomaa Aff., ¶ 4.) Because Ms. Elomaa did not directly oversee Kuhn or the other layoff candidates, she relied on the judgment of six managers who reported to her, including Fred Chavez. (Elomaa Aff., ¶ 5.) Elomaa requested that Chavez rank his direct reports based on the quality of their performance. (Chavez Dep. at 179.) Chavez ranked Kuhn last among his 17 direct reports because "[h]e didn't have the technical skill to handle the more complex problems. Didn't show the initiative. I couldn't rely—I felt that I couldn't rely on him to get tasks—well, I had assigned him tasks as a que[ue] coordinator, and they weren't done. I felt that I couldn't rely on him to get tasks done. He didn't seem interested in completing the work to the best of his ability." (Chavez Dep. at 180; Chavez Aff., ¶ 16.) Based on Chavez's assessment, Kuhn was among those selected for layoff.

As an additional basis for his age discrimination claim, plaintiff alleges that CSC refused to hire him for other positions for which he allegedly applied within the company prior to his layoff.

According to plaintiff, he expressed interest in two distinct positions: (1) a LAN or UNIX Queue Administrator; and (2) an Asset Management position.

In or about early 2001, Kuhn attended a meeting conducted by Fred Chavez in which Chavez asked whether anyone was interested in a job as a LAN or UNIX Queue Administrator. (Kuhn Dep. at 212-13.) Kuhn expressed interest to Chavez in the positions but did not get the job. (Kuhn Dep. at 213-14.) Kuhn did not know who made the hiring decisions with regard to the positions, nor did he know whether CSC actually hired *anyone* to fill the positions. Indeed, CSC never hired anyone for those positions. (Chavez Aff., ¶ 14.) Instead, CSC simply increased the workload and responsibilities of existing LAN and UNIX employees. (Chavez Aff., ¶ 14.) In this regard, CSC's decision not to offer plaintiff a job as a LAN or UNIX Queue Administrator was based not on plaintiff's age, but on the fact that CSC decided not to create any such position, opting instead to increase existing employees' responsibilities and workload.

Indeed, as explained in Section III(C)(2), *supra*, plaintiff simply was not qualified to be a Queue Administrator in the first instance and performed his job poorly. Accordingly, even if CSC had created a LAN or UNIX Queue Administrator position, it would have had every legitimate reason to fill the position with someone other than Kuhn. Moreover, in light of plaintiff's repeated

-23-

performance problems, CSC logically and appropriately filled the open Asset Management

position with other CSC employees.[9]

It is not the role of this Court to determine whether CSC made the best or wisest

employment decisions or even whether the Court would have taken some alternative action.  See

Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 400 (7th Cir. 1997), cert. denied, __ US.

__, 118 S. Ct. 1795 (1998) ("[t]his court has established that it 'does not sit as a super-personnel

department that reexamines an entity's business decisions'") (citation omitted); see also Norton v.

Sam's Club, 145 F.3d 114, 119-20 (2d Cir. 1998) (employers are not liable for doing "stupid or

even wicked things;" no liability absent sufficient evidence of discrimination); Scaria v. Rubin,

117 F.3d 652, 654 (2d Cir. 1997).  The question for the Court, therefore, is not whether CSC made

the best employment decision, but whether it has advanced a legitimate, nondiscriminatory reason

for the adverse employment actions against the plaintiff.  As explained above, CSC has advanced

such legitimate, nondiscriminatory reasons.

### 4.    Kuhn Has No Evidence That CSC's Legitimate Non-Discriminatory Reasons Constitute a Pretext for Age Discrimination.

Once CSC has articulated a legitimate non-discriminatory business reason, it then becomes

the plaintiff's burden to prove that CSC's articulated reason is a pretext for illegal discrimination.

---

[9] Upon recommendation by Fred Chavez and Mary Elomaa, CSC ultimately offered the Asset Management positions to David Bennett (age 51) and Monica Mancini (age 43), both of whom were already CSC employees.

-24-

There are a variety of ways that a plaintiff can prove his case through indirect proof. For example, a plaintiff can introduce evidence of an employer's criticism of his performance in age-discriminatory terms, see, e.g., Lopez v. S.B. Thomas, 831 F.2d 1184, 1189 (2d Cir. 1987); or by comments by management about persons in the same protected group as the plaintiff, see, e.g., Woroski, 31 F.3d at 109; or by showing more favorable treatment of employees not in the protected group, see, e.g., Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir. 1993); or by statistical evidence, see Hollander v. American Cyanamid, 999 F.Supp. 252, 259-60 (D. Conn. 1998), aff'd, 172 F.3d 192 (2d Cir. 1999).

Simply put, plaintiff has no evidence.[10] He has not identified a single individual at CSC whom he believes discriminated against him based on his age. (Kuhn Dep. at 221-22.) Moreover, he has repeatedly admitted at his deposition that he has no facts to support his claims of age discrimination. (Kuhn Dep. at 197, 214-15.) Indeed, the only information plaintiff identified to "support" his age discrimination claims were his allegations that: (1) CSC removed him from the Queue Administrator position and replaced him with Eric Anderson, a younger employee; and (2) CSC hired a younger person to work in plaintiff's department several weeks before plaintiff's layoff. (Kuhn Dep. at 211-12, 195-96.)

It is true that CSC assigned the ICMS Queue Administrator responsibilities to Eric Anderson, albeit only after plaintiff proved repeatedly that he was incapable of performing the

---

[10] The very fact that CSC hired plaintiff at the age of 61 belies his age discrimination claim.

-25-

position competently.  As to plaintiff's allegation that CSC hired a younger person to work in

plaintiff's department several weeks before his layoff, plaintiff has been unable to substantiate this

claim.  At his deposition, plaintiff testified that the only "fact" he had to support his claim that

CSC terminated his employment because of his age was that "four weeks before I was laid off they

hired a young fellow about 19 or 20." (Kuhn Dep. at 195.)  Plaintiff was uncertain as to the

identity of this individual, but thinks it was Todd Lovejoy.  (Id. at 195-96.)

Indeed, Todd Lovejoy did perform work for CSC, and was admittedly younger than

plaintiff.  Lovejoy's responsibilities, however, differed substantially from those of plaintiff.  CSC

retained Lovejoy as a contingent worker beginning in January 2001, months before CSC initiated a

workforce reduction.  (Chavez Aff., ¶ 15.)  CSC retained Lovejoy to work primarily in Trumbull.[11]

(Chavez Aff., ¶ 15.)  He worked as a Windows NT 4.0 technician, and CSC retained him

specifically to provide Windows NT 4.0 support for Sikorsky's Comanche Helicopter Project.

(Chavez Aff., ¶ 15.)  By contrast, plaintiff provided support for Windows 95, not Windows NT.

(Chavez Aff., ¶ 15.)

However, even if plaintiff could somehow show that he was replaced by a younger

employee, whether Todd Lovejoy, Eric Anderson or anyone else, "[r]eplacement by a younger

individual, while sufficient to establish the fourth element of a prima facie case, does not, standing

alone, indicate that defendant's proffered reasons for terminating plaintiff are pretextual."

---

[11] By contrast, plaintiff worked exclusively in Stratford.

-26-

Strohmeyer v. Int'l Bhd. of Painters & Allied Trades, 989 F. Supp. 455, 459 (W.D.N.Y. 1997),

aff'd, No. 98-7069, 1998 U.S. App. LEXIS 26002 (2d Cir. N.Y. Oct. 9, 1998).  Notably, plaintiff

repeatedly admitted at his deposition that he has no other facts to support his age discrimination

claims.  (Kuhn Dep. at 197, 214-15.)  When asked, "Do you have any other facts to indicate that

CSC terminated your employment because of your age," plaintiff replied, "No."  (Kuhn Dep. at

197.)  Similarly, with respect to plaintiff's factual support for his claim that CSC refused to hire

him for other positions for which he allegedly applied, the following colloquy ensued:

> Q.    Do you have any facts to indicate that the reasons that CSC didn't hire you for these
>       positions was because of your age?
>
> Mr. Burke.    Object to the form.
>
> A.    That was my feeling.
>
> Q.    Do you have any facts to indicate?
>
> A.    No.

Id. at 214.  It is well established that a generalized "feeling" that age was a motivating

factor in an adverse employment action is insufficient to defeat a Motion for Summary Judgment.

See, e.g., Lediju v. New York City Dep't of Sanitation, 173 F.R.D. 105, 114 (S.D.N.Y. 1997)

("Plaintiff's speculation and generalities (e.g., discrimination is self- evident), ... is insufficient

even to state a prima facie case...."); Little v. New York, 96 Civ. 5132, 1998 WL 306545, at *6

(E.D.N.Y. June 8, 1998) ("it is well settled that a plaintiff's speculations, generalities, and gut

feelings, however genuine, when they are not supported by specific facts, do not allow for an

-27-

inference of discrimination to be drawn.... Accordingly, a Title VII plaintiff cannot 'defeat a

motion for summary judgment by offering purely conclusory allegations of discrimination'").

Absent specific facts to support plaintiff's claims of age discrimination, CSC is entitled to

summary judgment on Counts One and Four.

> **D.**      **Kuhn Has No Evidence that CSC Retaliated Against Him for Opposing**
>              **Alleged Age Discriminatory Practices (Counts 2 and 5).**

In addition to his age discrimination claim, plaintiff also alleges that CSC retaliated against

him because he allegedly opposed age-discriminatory practices in the workplace. Specifically,

plaintiff claims that CSC terminated his employment because: (1) he "participated in a protected

activity of filing a charge of employment discrimination" with the EEOC and CHRO on

September 18, 2000; and (2) he allegedly complained to Fred Chavez on or about September 6,

2000 "that he believed he was being discriminated against based upon his age." (Compl., ¶ 43-44,

56-57.) 29 U.S.C. § 623(d) provides:

> It shall be unlawful for an employer to discriminate against any of his employees or
> applicants for employment. . .because such individual. . .has opposed any practice made
> unlawful by this section, or because such individual, member or applicant for membership
> has made a charge, testified, assisted, or participated in any manner in an investigation,
> proceeding, or litigation under this chapter.

Notably, plaintiff again admits that he has <u>no facts</u> to support his retaliation claim. When

asked whether he had any facts to indicate that the reason CSC terminated his employment was

-28-

because he had filed a charge with the CHRO and EEOC, plaintiff responded, "No, no facts." (Kuhn Dep. at 215-16.)

The only conceivable fact that plaintiff can argue "supports" his retaliation claim is the six-month temporal proximity between the time of his CHRO charge and the time of his layoff. That fact alone, however, is not enough. Courts in this district have specifically held that "[a]bsent any other evidence of retaliatory motive, mere temporal proximity alone is insufficient." Gallo v. Eaton Corp., 122 F. Supp. 2d 293, 304 (D. Conn. 2000); see also Lajuenesse v. A&P, 160 F. Supp. 2d 324 (D. Conn. 2001). Moreover, in Clark County School District v. Breeden, 532 U.S. 268 (2001), the United States Supreme Court noted that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case [of retaliation] uniformly hold that the temporal proximity must be 'very close.'" Id. at 273 (citations omitted). See, e.g., Rinsler v. Sony Pictures Entm't, Inc., 2003 U.S. Dist. LEXIS 14754 (S.D.N.Y. 2003) (six months too temporally remote to support retaliation when there is no direct evidence of retaliatory animus);[12] Cruse v. C&J United States Publ'g, 96 F. Supp. 2d 320 (S.D.N.Y. 2000) (passage of six months refutes any causal link); Cobian v. New York City, 2000 U.S. Dist. LEXIS 17479 (S.D.N.Y. 2000) (four months insufficient); Booker v. FRB of N.Y., 2003 U.S. Dist. LEXIS 3955 (S.D.N.Y. 2003) (four months proximity would not be enough by itself); Lajuenesse, 160 F. Supp.

_____

[12] Copies of all unreported cases cited herein are attached as Exhibit N.

2d 324 (D. Conn. 2001) (two months insufficient); <u>Hollander v. American Cyanamid Co.</u>, 895

F.2d 80, 84-85 (2d Cir. 1990) (no causal connection where three months separated complaint and

adverse action).

      Here, plaintiff's only evidence of retaliation is the six month period between the time of

his complaint regarding age discrimination and the time of his layoff. Because mere temporal

proximity is insufficient to establish retaliatory animus, and because a six-month gap, without

more, cannot support an inference of retaliation in any event, CSC is entitled to summary

judgment on Counts Two and Five of plaintiff's Complaint.

     **E.**    <u>**Kuhn Cannot Show That CSC Breached the Covenant of Good Faith and Fair**</u>
            <u>**Dealing Because There is No Contract Between the Parties.**</u>

      In Count Eight, plaintiff claims that CSC "intentionally breached the covenant of good

faith and fair dealing it owed to Mr. Kuhn, by wrongfully terminating Mr. Kuhn after he filed a

charge of employment discrimination with the EEOC and CHRO." (Compl. ¶ 69.) Plaintiff also

claims that CSC "further breached such employment covenant in bad faith when it unlawfully took

Mr. Kuhn's age into account when inflicting adverse employment actions upon him." (Compl. ¶

70.)

      The Connecticut Supreme Court has recognized that an implied duty of good faith and fair

dealing is imposed on parties to a <u>contract</u>. <u>Magnan v. Anaconda Indus., Inc.</u>, 193 Conn. 558, 566-

67, 479 A.2d 781 (1984) (emphasis added). This duty is "a rule of construction designed to fulfill

the reasonable expectations of the contracting parties as they presumably intended." <u>EIS v. Meyer</u>,

-30-

213 Conn. 29, 36-37, 566 A.2d 422 (1989)(quoting <u>Magnan</u> 193 Conn. at 567 (citations omitted)).

Naturally, if there is no contract between the parties, there can be no implied duty of good faith

and fair dealing. <u>DaCourt Group, Inc. v. Babcock Indus., Inc.</u>, 747 F. Supp. 157, 160 (D. Conn.

1990); <u>Bristol Safe Bank v. Cellino</u>, No. CV 910504535S, 1993 WL 197872, at *3 (Conn. Super.

June 2, 1993, *aff'd*, 34 Conn. App. 914, 642 A.2d 756 (1994)).

Here, the Complaint is completely devoid of any allegations of the existence of a contract

between plaintiff and CSC. Absent any such contract, plaintiff has not even properly pled, much

less proven, a breach of the covenant of good faith and fair dealing.[13] Because there is no

employment contract between plaintiff and CSC, there can be no breach of the covenant of good

faith and fair dealing, and Count Eight must be dismissed.

## IV.   CONCLUSION

For all of the foregoing, reasons, this Court should grant CSC's Motion for Summary

Judgment on Counts One, Two, Four, Five and Eight of plaintiff's Complaint.

---

[13] Indeed, the allegations underlying plaintiff's claim for breach of the covenant of good faith and fair dealing are the same allegations underlying his age discrimination claims and are encompassed in the other counts of the Complaint.

THE DEFENDANT,
COMPUTER SCIENCES CORPORATION

By _____
        Albert Zakarian (ct04201)
        Eric L. Sussman (ct19723)
        Day, Berry & Howard LLP
        CityPlace I
        Hartford, Connecticut 06103-3499
        (860) 275-0100
        Its Attorneys

## **CERTIFICATION**

THIS IS TO CERTIFY that a copy of the foregoing was sent via overnight mail, postage prepaid, to: Francis D. Burke, Esq., Mangines & Burke, LLC, 1115 Main Street, Suite 708, Bridgeport, CT 06604.

_____
Eric L. Sussman

-32-