# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICHARD W. KUHN | : | |
|   Plaintiff | : | |
| vs. | : | CASE NUMBER |
| | | 02-CV-363 (EBB) |
| COMPUTER SCIENCE | : | |
|   Defendant | : | OCTOBER 26, 2004 |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Richard Kuhn, respectfully files this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment dated June 14, 2004. As set forth below, Defendant's arguments are unavailing as to Counts One, Two, Four and Five of Plaintiff's Complaint.[1] Contrary to Defendant's assertions, Plaintiff has more than ample evidence to support his claims that he was unlawfully discriminated against and retaliated against because of his age and opposition to Defendant's unlawful conduct. In fact, it is Defendant who improperly attempts to rely upon "evidence" which is inadmissible, unreliable and completely lacking in foundation. For example, there is undisputed evidence that the 62 year old Kuhn was removed from his duties as ICMS Queue Administrator by his 32 year old supervisor, Fred Chavez, and replaced by a series of younger individuals in their twenties and thirties, including Eric Anderson (age

---

[1] Plaintiff will not be pursuing his claim for Breach of the Covenant of Good Faith and Fair Dealing (Count Eight), which is hereby withdrawn.

31).  When Mr. Kuhn expressed his displeasure and inquired whether his age played a part in the decision, he was threatened with termination, and told derisively that he could go "back to HR" if he wanted.  He was also told by Chavez that what happened to another employee he had terminated "could happen to you".  After his attempts to address the situation informally proved unsuccessful, Plaintiff filed administrative charges with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC").  Shortly thereafter, Mr. Kuhn was terminated as part of a purported Reduction in Force ("RIF").

The three affected individuals terminated as a result of the RIF were all over 40 years of age and therefore within the protected class under the ADEA, Mr. Kuhn (age 62, d.o.b. 10/20/38), Jerry Walker (age 59, d.o.b. 12/22/42) and Peter Vandeman (age 53, d.o.b. 8/20/48).  Moreover, Plaintiff and Jerry Walker were the two oldest individuals reporting to the purported decision maker, Fred Chavez, and the only two selected for termination.  At least fifteen individuals reporting to Chavez survived the RIF, all of whom were at least thirteen years younger than Plaintiff and many of whom were hired just shortly prior to the RIF.  Moreover, in the "comments" on the spread sheet used to facilitate the RIF (Ex. 5, CSC0610), only Kuhn ("Pending Age Discrimination Suit") and Walker ("Potential Age and Health Issue") noted EEO concerns, and both were terminated.  Defendant also admittedly failed to follow its own policies and procedures in carrying out the RIF, including failing to take into account employees' seniority and giving employees preference over contractors.

2

Following the RIF, purportedly initiated for "business reasons", Defendant posted Kuhn's and Walker's positions almost immediately, continued to hire younger individuals, both new hires and contractor conversions.  Defendant also documented its intent to fill open positions "after the dust settles" from the RIF.  Plaintiff was also unsuccessful in his attempts to obtain a new position with CSC immediately prior to and following the termination.  In fact, when Mr. Kuhn's former supervisor indicated that he thought Plaintiff would be a candidate for an Asset Management position (which was ultimately filled by yet another younger individual), Mary Elomaa, another of the purported decision makers, sent him an e-mal indicating that she did not think it would be a good idea to bring him back to CSC.  (Ex. 5, CSC0586-87).

It is Defendant who has clearly failed to meet its burden of demonstrating that there are no genuine issues of material fact.  While Defendant bases its claims on Kuhn's supposed performance deficiencies, it has absolutely no documentary evidence to support its claims, with the exception of a purported draft performance evaluation which was not even produced until June 2001, some three months **after** Plaintiff's termination and **after** he had filed his second administrative charge with the CHRO and EEOC alleging age discrimination and retaliation relative to his March 30, 2001 termination.  Plaintiff on the other hand, has a series of positive performance evaluations dating back years, including one he received from Defendant in May of 2000, less than nine months prior to his termination.  Of course, the Supreme Court has recently reaffirmed that evidence from the moving party on summary judgment should

3

not be credited unless it is uncontradicted, unimpeached and comes from disinterested witnesses.  Reeves vs. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2110 (2000).  Defendant's evidence clearly fails all three of the above tests.

Plaintiff urges that, taken as a whole, there is more than ample evidence to support an inference that Plaintiff suffered adverse employment actions as a result of Defendant's unlawful discriminatory and retaliatory animus.  When viewed in the light most favorable to Plaintiff, and with all inferences draw in his favor, Plaintiff has presented more than sufficient evidence to establish at least a genuine issue of material fact as to whether his age and opposition to discriminatory practices were factors in Defendant's decision to terminate him on March 30, 2001, as well as the other various adverse employment actions Plaintiff endured.  As such, summary adjudication would be entirely inappropriate based upon this record.

## I.    FACTS

Plaintiff, Richard Kuhn, was born on October 20, 1938 (Ex. 5, CSC0431).  Plaintiff was employed as a computer technician for over 22 years prior to his termination on March 30, 2001, at the age of 62 (Ex. 1, ¶1).  Plaintiff was employed by Digital Equipment Corp. ("DEC") from 1979 to 1991 as a Field Service Representative, servicing their computers and printers (Ex. 1, ¶¶20-31; Ex. 2 at 21-26).  For the last three to four years of Plaintiff's employment with DEC, he was assigned as an on-site engineer at Sikorsky Aircraft in Stratford.  Id.  Plaintiff reported to Sikorsky every day and installed their computer base, including micros and minis, laptops and desktops.  Id.

4

In approximately 1991, Plaintiff was approached by Sikorsky and accepted their offer to become a permanent employee.  Id.  Plaintiff worked for the next nine years as a Senior PC Technician, doing the same work that he did for DEC.  Id.  Effective January 1, 2000, United Technologies Corp. ("UTC") outsourced its IT departments to Defendant CSC Corporation ("CSC").  Id.  As a result, Plaintiff and others became CSC employees as of January 1, 2000.  Pursuant to the Agreement between CSC and Sikorsky, Plaintiff and the others retained their UTC seniority and were guaranteed employment for at least one year. (Ex. 2 at 20-23).

Plaintiff initially performed the same duties for CSC as he had for Sikorsky and, prior to that, DEC. (Ex. 2 at 26-27).  In approximately March 2000, Plaintiff was approached by his manager at CSC, Frank Villa, and asked to assume the duties of the ICMS Queue Administrator.  Id.  This position was responsible for distributing requests received from the help desk for installs, changes, moves and surplus of equipment to technicians. (Ex. 2 at 27-28).  In May of 2000, Plaintiff received a positive performance review from his then current CSC manager, Frank Villa, which included both his previous duties as a technician and his then current duties as ICMS Queue Administrator.  (Ex. 5 at CSC032-38.)  Also with this review, Plaintiff received a merit increase of $1,761.61 per year. (Ex. 5 at CSC0135).

On or about May 11, 2000, Fred Chavez (d.o.b. 12/16/67) was hired by CSC and shortly thereafter replaced Glen Gordon, who was approximately fifty years of age at the

time[2], as the manager of Plaintiff's department.  Contrary to Defendant's assertions, Plaintiff informed Chavez well in advance that he was scheduled to go on vacation in July, 2000.  Chavez eventually informed Plaintiff that Eric Anderson (d.o.b. 3/20/69) would assume the Queue Administrator position while he was on vacation, prior to assuming the duties for which he was recently hired.  When Plaintiff returned from vacation on or about August 1, 2000, he was informed by Anderson that he was no longer going to be the ICMS Queue Administrator, but that Anderson was assuming those duties.  He was told that he was to physically dismantle surplus computer equipment in the back room and transport it to the dumpster.  (Ex. 2  at 29-31.)  Plaintiff believed that by putting him in such a junior position, Defendant was trying to get rid of him.  Kuhn approached Chavez to inquire about the change in assignment.  Chavez informed Plaintiff that he wanted Anderson to institute the new CSC processes and procedures that were being implemented.  No mention of any performance issues on Plaintiff's part was made.  (Ex. 3 at 58, 86).  Plaintiff asked if his age (61) had anything to do with Chavez's decision to replace him with the thirty-one year old Anderson. Chavez said no.  (Ex. 2 at 29-30.)

On August 3, 2000, after speaking with Chavez, Plaintiff called Joe Anastasia, a Human Resources representative at CSC.  Kuhn reported his concerns at having been summarily replaced as Queue Administrator by the younger and less experienced Anderson.  Anastasia indicated he would "look into it".  Unfortunately, Anastasia

---

[2] Although a former Sikorsky employee, Mr. Gordon's name and date of birth do not appear on the list of new hires provided by defendant. (Ex. 5 at CSC 0433-44).

suffered a heart attack shortly thereafter and missed several weeks of work (Ex. 2 at

116-17).  As a result, on August 15, 2000, Plaintiff sent an e-mail to Carl Bishopric,

another Human Resources manager at CSC.  (Ex. 2 at 15, 116-17).  The next day, on

August 16, 2000, Plaintiff was called to a meeting with Chavez, Anderson, Rob Gaynor

(Chavez's supervisor), Tilitha Brown and Dave Defeo.  Id.  Plaintiff was informed that he

would be provided whatever training and assistance he required to be successful.

Plaintiff was also asked, and agreed, to begin working 8 a.m. to 5 p.m.  Plaintiff had

previously been working 6:30 a.m. to 3:30 p.m. while with both Sikorsky and CSC.

(Kuhn Depo. at 116-122).  As a result of this meeting, Kuhn was reassigned to his

former position of ICMS Queue Administrator beginning August 21, 2000.

On August 25, 2000, Plaintiff was asked to attend a focus group meeting with

nine other CSC employees who had previously worked for Sikorsky.  (Ex. 1 at 43-46).

Nine of the ten, like Mr. Kuhn, were over the age of 40.  (Ex. 2 at 4-5).  The employees

who attended this focus group, including Mr. Kuhn, explained how they were mistreated,

harassed and intimidated by CSC managers.  Kuhn related how he was walking through

the UNIX Department one day with Chavez who said, "I want to know what it feels like

to fire someone.  I want to fire someone today."  Carl Bishopric, who was conducting the

meeting, stated that he was shocked by what he was hearing and that he would handle

it.  (Ex. 1 at 43-46; Ex. 2 at 206-210.)  Following the meeting, Chavez and Gaynor were

inquiring of employees if they knew who had attended the focus group meeting.  (Ex. 1

at 46).  On August 28, 2000, just four days after participating in the focus group, and

only one week after being reassigned to his former position, Chavez informed Plaintiff that he was again being demoted and would no longer be allowed to continue as ICMS Queue Administrator.

Plaintiff repeatedly attempted to discuss his concerns directly with Chavez. Chavez responded by telling Kuhn that the same thing that happened to Dave (last name Hines or Heller, an employee recently terminated by Chavez) could happen to him. (Ex. 1 at 40, Ex. 2 at 113-15; Ex. 3 at 158).   Chavez also stated in a condescending tone that Kuhn could go back to Human Resources to complain if he wanted to.  (Ex. 2 at 113-115.)  On September 6, 2000, Plaintiff met with Chavez in the presence of Tilithia Brown.  During this meeting Kuhn directly expressed his belief that he was being discriminated against because of his age.  (Ex. 2 at 210-11).  Again, Plaintiff's concerns went unaddressed.

On or about August 24, 2000, Mr. Kuhn filed a dual charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Connecticut Commission on Human Rights and Opportunities ("CHRO") based on his discriminatory treatment and unlawful demotion from the ICMS Queue Administrator position.  The Defendant was served with copies of Plaintiff's charge and filed an in-depth response. Thereafter, in a transparent attempt to appease him, Plaintiff was allowed to assume the role of Problem Resolution Queue Administrator from 6:30 a.m. to 9:00 a.m., performing the duties of a Desktop Technician for the remainder of the day.  On October 11, 2000, Chavez sent an e-mail to Kuhn expressly acknowledging that he was doing a good job

8

at the Queue Administrator piece.  (Ex. 5 at CSC 0067).  Chavez also stated that "we can not afford to lose your skills in the PC Supp[ort] role."  Chavez further noted that the number of backlogged tickets should decrease with "the addition of three new technicians".  Id.  This, of course, supports Plaintiff's argument that any "backlog" was not due to any performance issues on his part, but due to other factors such as lack of adequate staffing.  It also raises questions as to why Defendant was hiring new (and younger) employees in October 2000, shortly prior to the RIF, and why none of these new hires was eliminated as part of the RIF rather than Mr. Kuhn (whose skills Chavez expressly acknowledged CSC could not afford to lose) or Mr. Walker.

Chavez concedes that at no time prior to his termination was Plaintiff advised that his performance was less than satisfactory.  (Ex. 3 at 58, 86.)  In early 2001, in an attempt to get away from reporting to Chavez, Plaintiff applied for other positions, including an Asset Management position and Queue Administrator positions in both the UNIX group and the LAN group.  On March 30, 2001, while he was still waiting to hear about those other positions, Plaintiff was terminated, purportedly due to a reduction-in-force ("RIF").  Plaintiff's former supervisor, Glen Gordon, who had supervised Kuhn at both CSC and Sikorsky and was, therefore, familiar with his qualifications, sent an e-mail to Mary Elomaa indicating his believe that "Dick [Kuhn] might be a good candidate for the Cycle Counting Analyst (CCA) role".  (Ex. 5 at CSC0597.)  On April 5, Elomaa wrote back indicating:

> "As for Dick Kuhn I did not add his name to the list as he was on our RIF list. I am not sure that bringing him back onto the Sikorsky account would be a good thing." (Ex. 5 at CSC0587.)

This appears to directly contradict CSC's published policies dealing with layoffs (Ex. 5 at CSC0184-190) which states that when an employee is laid off for business reasons:

- The business unit Human Resources Director shall immediately notify the business unit Internal Placement Coordinators … who shall then notify other CSC Internal Placement Coordinators. (Ex. 5, CSC0185 at ¶4.2.2.)

- An employee … may … be offered a position which results in a change of assignment or responsibilities to include a demotion in salary, grade and/or responsibility as an alternative to layoff. (Ex. 5, CSC 00186 at ¶4.3.1.)

- Selection for reinstatement shall be based on a consideration of factors which will include, but not limited to, CSC needs, and the skills, knowledge, ability, reliability, performance and length of service of the employee. (Ex. 5, CSC 00188 at ¶7.1.)

Defendant's policies obviously favor giving an employee an opportunity to transfer into other open positions for which he is qualified as an alternative to a layoff, and to be recalled to subsequent openings. Glen Gordon, who was extremely familiar with "CSC needs, and the skills, knowledge, ability, reliability, performance and length of service" of Mr. Kuhn, obviously felt he was qualified. While Ms. Elomaa does not explain why she didn't think brining back Mr. Kuhn would be "a good thing", a juror could

reasonably infer that Mr. Kuhn's age and/or administrative charges of discrimination may have played a part in her thinking.

Defendant concedes that "CSC retained Todd Lovejoy as a contingent worker beginning in January 2001." (Def. Ex. B, ¶15.) Defendant claims that Kuhn was not qualified for this position because CSC "retained him specifically to provide Windows NT 4.0 support" and "Mr. Kuhn provided support for Windows 95, not Windows NT." Unfortunately for Defendant, this claim, which is patently false, is undermined by its own documents, which clearly show that Kuhn was, in fact, experienced in Windows NT 4.0. (Ex. 5 at CSC0084, 0087.) Similarly, Defendant concedes that on April 17, 2001, just two weeks after the purported RIF, it posted openings for two Systems Administration positions at Sikorsky. Plaintiff testified credibly that the postings were for positions that were remarkably similar, indeed virtually identical to the positions from which he and Jerald Walker were laid off. (Ex. 2 at 216-17). This raises a genuine issue of material fact as to the validity of the purported RIF, and supports an inference that Defendant's stated reasons are pretextual.

Jerald Walker (d.o.b. 12/22/42), who was 58 years of age at the time,[3] was the only other individual reporting to Fred Chavez who lost his job in the RIF. All of the remaining employees reporting to Chavez were younger than both Kuhn and Walker. In fact, all of the employees who remained were at least thirteen years younger than Kuhn.

---

[3] Although Defendant's records have consistently listed Jerald Walker's date of birth as June 1, 1960 (see, e.g., Ex. 5 at CSC00436) despite the fact that Plaintiff has repeatedly pointed out this error (Ex. 1, ¶53-54), Defendant's counsel has recently concurred that he was, in fact, born on December 22, 1942.

Defendant has conceded that plaintiff's Queue Administrator duties were assumed by the 32 year old Derek Heard and the remainder of his duties and responsibilities were assumed by the other desktop technicians, all substantially younger.  (Ex. 4 at 3.)  The RIF caused the average age of Chavez direct reports to decline by nearly three years, from 38.18 to 35.26.

## CHAVEZ DIRECT REPORTS 2/27/01

| NAME | DOB | AGE |
|------|-----|-----|
| Richard Kuhn | 10/20/38 | 62 |
| Jerald Walker | 12/22/42 | 58 |
| Richard Lovell | 6/13/51 | 49 |
| George Jaser | 4/15/51 | 49 |
| Monica Mancini | 7/10/59 | 41 |
| Silvia Firpi | 8/19/59 | 41 |
| Kenneth McArthur | 8/26/60 | 40 |
| Richard Blaszyck | 7/11/64 | 36 |
| James Iacoviello | 1/16/66 | 35 |
| Todd Palumbo | 3/15/68 | 33 |
| Matthew Seese | 10/13/70 | 32 |
| Derek Heard | 11/6/68 | 32 |
| Eric Anderson | 3/20/69 | 32 |
| Victor Arroyo | 7/14/69 | 31 |
| Barbara Frankiewicz | 9/27/69 | 31 |
| Cheryl Ninno | 11/6/76 | 24 |
| Chris Biscoglio | 5/5/77 | 23 |

Average Age  Pre-RIF     38.18  (649/17)
Average Age  Post-RIF    35.26  (529/15)

(Ex. 4 at 7, Ex. 5 at CSC 0419-436)

Both Kuhn and Walker had been specifically identified as having "issues" as part of the RIF process, "Pending Age Discrimination Suit" in the case of Kuhn and "Potential Age and Health Issues" with regard to Walker.  (Ex. 5 at CSC0610.)  No such concerns

were noted with regard to any other employees listed on the document, and none were selected for the RIF.  It should also be noted that CSC management specifically stated that such "HR concerns" should be noted and that they would be "taken care of".  In a March 19, 2001 e-mail related to the reduction-in-force, CSC's Henry Kerser advises his managers that the RIF "could have a good effect and would be helpful in general.  If you have problem cases and HR has not worked them, this is the time to do so.  Get them on the list and put them on the top with a comment indicating the problem case and it will be taken care of." (Ex. 5 at CSC0623).  Defendant certainly "took care of" Kuhn's "pending age discrimination suit" and Walker's "potential age and health issues" when it terminated the two of them on March 30, 2001.

Defendant continued to hire younger employees and contractors immediately following the purported RIF, including Ben Grussi, Chris Bruscia, Dennis Willis (d.o.b. 9/28/74) and Todd Lovejoy (d.o.b. 4/25/67) in Mr. Kuhn's department.  It is interesting to note that while Chavez testified that it was his understanding that contractors were to be let go before employees (Ex. 3 at 201), the 26 year old Dennis Willis, who was rated as a "4" by Chavez (along with 3 other contractors), not only survived the RIF, but was converted to a CSC employee just seven months later.  (Ex. 5 at CSC0433, 00631.)[4] Defendant's reliance on a RIF is further undermined by the fact that its own documents indicate "We would like to retain these contractors and convert to other positions when the dust settles.  This will allow us to fill some of our open positions and customer

_____

[4] This reference is to the first of two documents bates stamped CSC0631.

commitments." (Ex. 5 at CSC0609.) A juror could certainly infer that the fact that Kuhn

and Walker had noted "age and health issues" was a motivating factor in defendant's to

terminate them rather than similarly situated (but younger) contractors as well as less

experienced, newly-hired employees who were also substantially younger and had no

noted complaints or issues.

**II.    <u>ARGUMENT</u>**

1.    <u>DEFENDANT'S CLAIMS OF PLAINTIFF'S PERFORMANCE ISSUES ARE AT
       BEST EXAGGERATED AND AT MOST FALSE AND PRETEXTUAL</u>.

Defendant's claim that Plaintiff was terminated as a result of his poor

performance is undermined not only by Plaintiff's testimony, but by a long history of

positive performance, including a formal written performance appraisal from CSC in

May, 2000, as well as other documentary and testimonial evidence. Moreover,

Defendant's current claims contradict Fred Chavez's own sworn deposition testimony.

For example, Defendant now claims that

> "Chavez became the Desktop Manager, and plaintiff's supervisor in May
> 2000. Shortly thereafter, plaintiff's performance problems became readily
> apparent to Chavez. For example, in June 2000, on more than one
> occasion, CSC's back office had to send numerous incomplete PWOs
> back to plaintiff for his completion because he did not complete the
> information in the first instance, as he was supposed to do."

(Def. Memo at 6.) (citations omitted.) In fact, Chavez testified that he was unaware of

any performance issues regarding Plaintiff until the end of July 2000, when he decided

to replace Plaintiff as ICMS Queue Administrator with the thirty one year old Eric

Anderson (d.o.b. 3/20/69).  (Ex. 3 at 58).  Moreover, Plaintiff testified that he was never

informed by Chavez or anyone else about any performance issues or concerns, a fact

with which Chavez agrees.  Indeed, the only explanation offered when Plaintiff inquired

as to why he was being replaced by Anderson was that Chavez "wanted him to

implement the new procedures that were coming down" (Kuhn Depo. at 29-30).  These

facts must be taken as true, as a matter of law, in deciding Defendant's motion.

Defendant's current reliance on issues related to Property Work Orders which allegedly

occurred in June of 2000, and any other purported issues arising prior to prior to the end

of July 2000, is obviously pretextual in light of Chavez's admission that he was not

aware of any performance issues on Plaintiff's part at that time.  (Ex. 3 at 58, 86).

     Plaintiff testified that during the period he was working as a Queue Administrator,

his department was understaffed.  This, rather than any performance issues on

Plaintiff's part, led to a backlog of tickets.  This is implicitly acknowledged in Chavez's

own e-mail to Plaintiff in which he notes not only that Plaintiff is performing well and that

his skills are needed, but that the addition of three additional technicians should help

reduce the backlog.  (Ex. 5 at CSC0067).  Defendant's reliance on a handful of

unsubstantiated and unsupported "incidents" is similarly unavailing.  Plaintiff handled

literally thousands of requests for service during his employment with CSC.  As he

testified, there were often delays resulting from incomplete information, parts that

needed to be ordered, missing asset tags, customer unavailability, and other issues.

(Ex. 2 at 145).  It is hardly surprising that Plaintiff could not recall the specifics of

individual requests when asked about them for the first time nearly two years later at his deposition.  Nor is it surprising that in the transition from Sikorsky to CSC, with the implementation of new policies, procedures and personnel, that there would be some problems along the way.  Indeed, Chavez concedes that the department was in "chaos" during the period in question, and that it takes up to three years for an account to mature.  (Ex. 3 at 15-16).  Even Defendant's contracts with UTC had a ten percent (10%) margin of error built into them since Level Agreements ("SLAS") require only ninety percent (90%) to be completed in a certain time frame.  Moreover, these SLAS did not go into effect immediately as both CSC and UTC recognized that it would take time to get up to speed and that those goals could not be achieved during the transition period.  Defendant has failed to prove that any of the specific issues or problems it attempts to impute to Mr. Kuhn's "poor performance" were in fact properly attributed to him.  Moreover, while Defendant has had ample time to scour its records in an attempt to document Mr. Kuhn's purported "poor performance", these tickets represent only a tiny fraction of the thousands of tickets Plaintiff handled during his employment with CSC.  Chavez also admits that he received complaints about employees other than Mr. Kuhn, and that he neither looked for nor produced documents showing similar issues involving these other employees.  (Ex. 3 at 229).  Defendant's efforts are nothing but a transparent attempt to cover the tracks of its discriminatory and retaliatory misconduct by attempting after the fact to build a case based on "performance" long after the fact.

It should also be noted that Mr. Kuhn was moved in and out of the ICMS Queue Administrator position and for many months was acting as Problem Resolution Queue Administrator for only two to three hours in the morning, with someone else performing these duties for the bulk of the work day.  Indeed, even this agreed upon arrangement was not honored by Defendant.  (Ex. 5 at CSC0067).  Moreover, many individuals were involved in handling and responding to service requests at CSC including the help desk, Queue Administrators, technicians, customer account coordinators, service delivery managers and others.  Defendant's attempt to place responsibility for every problem that developed during that time frame on Mr. Kuhn's doorstep is completely transparent and entirely unsupported.

Defendant concedes that "After the Desktop Technicians completed assigned work, they were required to complete Property Work Order Forms ("PWOs"), which contained information about the work performed".  (Def. Memo at 6.)  Thus, Defendant concedes that the Desktop Technicians themselves, not just the Queue Administrator, were responsible for filling out the information on PWOs.  Moreover, the information often originated with the help desk, account managers, or other individuals responsible for entering in the information correctly in the first instance.  Defendant's attempts to place the responsibility for any shortcomings or delays in a work environment which was admittedly chaotic and constantly changing, is obviously contrived, pretextual, after-the-fact apologia.

Defendant concedes that other CSC employees would record the necessary information in a "ticket", before it even arrived at Mr. Kuhn's desk.  "CSC personnel would record the problem or task in an electronic "ticket" and, if they were unable to address it over the phone, they would transfer the ticket electronically to Plaintiff, as the Queue Administrator".  (Def. Memo at 5, footnote omitted.)  As this illustrates, other CSC personnel shared responsibility for filling in information on tickets and PWOs, as well as attempting to resolve issues and problems over the telephone before passing them along to other employees.  The fact that specific tickets or PWOs may have contained incomplete information, or that a technician may have been able to achieve a telephone fix after others tried does not mean Plaintiff was a bad performer.  In fact, CSC's own documents confirm that this is how their system is designed to work:

- Resolving the problem "may involve transferring the call to various technicians until a full diagnosis or fix has been achieved."  (Ex. 5 at CSC0054).

- "The Workflow Manager [and not the Queue Administrator] has primary responsibility for work prioritization, including the escalation of problems."  (Ex. E at CSC0390.)

- "The ICMS Queue Administrator works closely with Acquisitions, Service Delivery Coordination, Receiving, Staging, Asset Management and ICMS …"  (Ex. E at CSC0391.)

- "The [Problem Resolution] Queue Administrator has secondary responsibility for prioritizing work and escalating individual problems, as required, the WFM Manager has primary responsibility for these functions.  The Queue Administrator escalates problems, as required, with input from the Customer Support Services ("CSS") Center / Help Desk and customers." (Ex. E at CSC0391.)

18

- "Most of the other information should be completed by field technicians before leaving the work site. I am sure everyone involved in this process understand the value and importance of the requested information." (Ex. F at CSC0039.)

Virtually all of Defendant's criticisms of Plaintiff's job performance deal with his Queue Administrator duties. However, as stated above, he was performing those duties for only a fraction of his work day for months prior to his termination. The record is devoid of any evidence that Kuhn failed to perform the majority of his duties as a Desktop Technician. This is not surprising since he had a long and proven track record as a technician for over 22 years, including over fourteen at Sikorsky while working for DEC, Sikorsky and CSC. Defendant offers no explanation as to why he was not retained as a technician.

Defendant's claims that Kuhn was a poor performer is also undermined by its own documents. In May of 2000, Plaintiff received a positive performance evaluation from his then current manager at CSC, Frank Villa (Ex. 5 at CSC 0032-38). This review encompassed his performance as both a technician and as ICMS Queue Administrator. Plaintiff also received a merit increase along with this review. (Ex. 5 at CSC0135). Frank Villa confirms that Mr. Kuhn was an outstanding technician and was transitioning well into his new duties of ICMS Administrator. The record is entirely devoid of any performance issues on Plaintiff's part prior to the end of July 2000. Indeed, Chavez himself concedes that he was unaware of any issues prior to that time. Moreover, not only were these purported "performance issues" never documented but they were never even brought to Plaintiff's attention. He was simply told that Chavez wanted the thirty

19

one year old Anderson to "implement the new policies and procedures that were coming

down". Defendant relies on a performance review that Mr. Kuhn admittedly never saw

and to which he had no opportunity to respond, as well as a ranking of Mr. Chavez's

direct reports which Defendant has not produced, saying that it cannot be located. Lo

and behold, the result of these performance ratings and rankings were that Plaintiff, at

age 61, rated last, while Jerald Walker (age 59) ranked second to last. While Defendant

claims that the fact that they also rank as the oldest (Kuhn) and second oldest (Walker)

members of the department is just a coincidence, a juror could certainly reach the

opposite conclusion in light of all the circumstances. Certainly, genuine issues of

material fact exist that would render summary adjudication improper.

The Second Circuit has stated that an employee's testimony that his job

performance was satisfactory is no less conclusory than the employer's statements to

the contrary. "[Plaintiff's] claim that his performance had remained acceptable is no

more conclusory than [Defendant's] assertion that it had deteriorated." Danzer v.

Norden Systems, Inc., 151 F.3d 50, 57 (2nd Cir. 1998). Where, as here, Plaintiff's

testimony about his performance contradicts Defendant's purported reasons for

selecting him for the RIF, the case should go to the jury for resolution of the factual

dispute. Collier v. Budd, Co., 66 F.3d 888 (7th Cir. 1995). Moreover, Frank Villa

confirms that Plaintiff was performing well at his position for CSC in May 2000, just eight

months prior to the performance evaluation purportedly prepared by Chavez in January

2001, and less than ten months prior to the time Chavez purportedly ranked him dead

20

last among his direct reports in March 2001.  Plaintiff's testimony, coupled with Plaintiff's exemplary record of performance over more than twenty years, combined with his May 2000 performance evaluation, is more than enough to demonstrate a genuine issue of material fact as to Plaintiff's performance.  In addition, Chavez himself admitted in an October 11, 2000 e-mail to Plaintiff that he was "doing a good job at that [Queue Administrator] piece", and that CSC "could not afford to lose your skills in the PC Supp[ort] role."  (Ex. 5 at CSC0067).

It should also be noted that many of the younger, newly hired employees who were ranked higher than Kuhn and Walker had virtually no experience.  For example, Sylvia Firpe lists among her significant accomplishments that "Being new to the IT field, I have gained a vast knowledge in a short period of time since my date of hire (on 9/18/00);" and listed among her goals to "obtain my Windows 2000 MCSE certification within the next eight months"  (Ex. 5 at CSC0463).  In addition to the fact that Kuhn and Walker were obviously far more skilled and experienced than Firpe, Chavez himself noted in his evaluation that:

- Sylvia's inexperience in the IT field seems to hinder her (Ex. 5 at CSC0465).

- Sylvia has gained a significant amount of "on the job" knowledge[5] (Id.)

- Sylvia is new to the IT industry and is appropriately cautious with her decisions. (Id.)

---

[5] It would certainly be reasonable to assume that Firpe had gained less "on the job knowledge" in six months than Kuhn and Walker had in their forty plus combined years of experience.

21

Unbelievably, despite her inexperience and noted shortcomings, Firpe was rated a "2" (Very Good).

Barbara Frankiewicz was also rated a "2" despite the fact that Chavez noted that "she still has not been able to adhere to the CSC dress code" and "I can never tell what time she will show up in the morning." (Ex. 5 at CSC0475.)

Similarly, Richard Lovell was rated higher than Kuhn and Walker despite the fact that his "goal" was to "begin classes towards MCSE" (Ex. 5 at CSC0487). In addition, Chavez noted that

- While Rich was stationed in Stratford he rarely, if ever, showed any initiative. He would come in earlier and sit around until the rest of team would show up and then take what tasks were assigned to him. He would then leave early." (Ex. 5 at CSC0489)

- While in Stratford he had great difficulty showing up at the time he was scheduled. He would not stay to his scheduled time and would not take offsite tickets. (Id.)

- Rich still fails to meet specified CSC dress code on a regular basis even though I have brought it to his attention personally. (CSC0490)

- Rich was unable or unwilling to adhere to this schedule and either came in whenever he chose to or called in. The only way to meet Rich's scheduling needs was to let him work whenever he wants to. This schedule would be different daily. This is unfair to the other technicians and caused disruption while he was here at Stratford. The schedule had to be made to fit his needs and this affected the team negatively. (CSC0491)

Monica Mancini was also rated a "2" despite the fact that her significant accomplishments were, "Job related accomplishment to me has [sic] been when I became a part of Desktop support when signing on with CSC. I have achieve (sic) the

knowledge in computer hardware by on the job training with which I had very little knowledge before". (CSC0505). She listed her "personal goal is to get my Associate degree [sic] Computer Science/Information Technology within the next three years." (Id.) Plaintiff already possessed his Associates' Degree, in addition to vastly superior experience, skills, knowledge and training. Chavez himself noted that knowledge "is still her weakest area. She is weak here only due to inexperience and as she pursues her certifications, this score will improve." (CSC0507) This is, of course, stereotypical ageist thinking, that younger employees will improve whereas with regard to older employees such as Kuhn and Walker, "you can't teach an old dog new tricks." Indeed, Chavez also notes that Mancini "is not able to work independently … when she encounters newer equipment or software." (Id.)

The 24 year old Cheryl Ninno notes among her significant accomplishments that "Since my date of hire on September 5, 2000, my experience and confidence in my ability to perform job responsibilities has increased significantly." (Ex. 5 at CSC0525). Despite this, Chavez notes that "she is reluctant to work on her own. She usually ends up paired off with another employee. This is due, in part to her inexperience with the environment." Nonetheless, she was also rated a "3".

Jerry Walker's self-evaluation notes that "for this year I have closed 118 calls as of 2-15, averaging 4.5 calls per day…" (Ex. 5 at CSC0533). Obviously, these objective numbers have been entirely ignored by Defendant. Indeed, Chavez confirms Walker's high number of ticket closures but nonetheless rates him as "needs improvement" for

"Quality of Output", noting "Although Jerry closes a large number of tickets, sometimes this comes at the cost of quality." Compare this to Chavez's comments with regard to the 32 year old Matthew Seese that the "Quality of Output" rating "is difficult to measure fairly as the technicians are faced with a growing workload and are required to close tickets quickly in order to keep the numbers down." (CSC0519)

Similarly, with regard to "knowledge", while Chavez concedes that Walker "has a vast knowledge of past technology", he nonetheless rates him as "needs improvement". Sylvia Firpe, by contrast, is rated "good" because she has gained significant amount of on the job "knowledge" in her 6 months. The 24 year old Cheryl Ninno is also marked "Good" despite the fact "she usually ends up paired off with another employee. This is due, in part, to her inexperience with the environment." (CSC0528) Similarly, Walker is marked as "needs improvement" in "Dependability" despite the fact that he "gets his work done on time and is dependable in this respect" apparently because "at one time, Jerry took the day of without consulting me. He informed a member of my staff that he was going to take the day off." (CSC0537) Incredibly, the 31 year old Barbara Frankiewicz is rated as "Very Good" in this category despite the fact that Chavez "can never tell what time she will show up in the morning." (CSC0475)

Plaintiff was likewise rated as "needs improvement" in "knowledge" despite his vastly superior experience, education and training. While Defendant argues that Plaintiff and Walker were terminated as a result of their performance, it is certainly just as plausible that the evaluations were drafted to achieve the desired result, the

24

elimination of the two oldest members of the department.  This is especially so given

that Kuhn was rated as "Good" with regard to knowledge on his May 2000 appraisal by

CSC.  (Ex. 5 at CSC0034).   Presumably, Kuhn didn't lose any knowledge in the six

months between the two reviews.  Indeed it is difficult to reconcile the May 2000

assessment which notes that Kuhn is "a very competent technician with a great deal of

exposure to printer trouble-shooting" who "indicated he wanted new challenges and

stepped forward to take on the role of ICMS queue manager" and "has been fully

devoted to this task" (Ex. 5 at CSC0036) with the employee described in the 2001

assessment purportedly done by Chavez some six months later.  Of course, Chavez's

assessment of Plaintiff was prepared only **after** Plaintiff had accused him of

discrimination and filed administrative charges with the EEOC and CHRO, and only

Chavez' own testimony support's Defendant's contention that the evaluation was

completed prior to Plaintiff's termination and second administrative filing rather than

after.

2.    <u>THERE IS AMPLE EVIDENCE TO SUPPORT PLAINTIFF'S AGE
      DISCRIMINATION CLAIMS</u>.

Only two people who reported directly to Chavez were terminated in the RIF on

March 30, 2001.  They were the two oldest employees reporting to Chavez, Dick Kuhn

(age 61, d.o.b. 10/20/38), and Jerald Walker (age 58, d.o.b. 12/22/42).  Moreover, Kuhn

and Walker were also noted as having human resources issues, a "Pending Age

Discrimination Suit" in the case of Mr. Kuhn, and "Potential Age and Health Issues" in

the case of Mr. Walker.  (Ex. 5 at CSC0610.)  The fifteen remaining individuals reporting

to Chavez who were retained were all younger and had no "HR concerns" noted.

Plaintiff urges that this is, in and of itself, sufficient to support an inference that Plaintiff's

age and prior complaints of discriminatory treatment were at least motivating factors in

Plaintiff's termination on March 30, 2001.  The Second Circuit has held that, "In a

consolidation of two departments, where three older employees were terminated and

twenty younger employees were retained, there was a sufficient inference of discrimination

to survive summary judgment."  Maresco v. Evans Chemetics, 964 F.2d 106 (2nd Cir.

1992).  See also, Chertkova v. Connecticut General Life Insur. Co., 92 F.3d 81, 91 (2d Cir.

1996); Gallo v. Prudential Residential Services, L.P., 22 F.3d 1219 (2d Cir. 1994).  "If an

employee establishes a prima facie case in a reduction in force case and shows that

younger employees were retained, and the employer had fired older employees before

their retirement age, summary judgment should be denied."  Tuck v. Henkel Corp., 973

F.2d 371 (4th Cir. 1992).

There is no question that Plaintiff was removed from the ICMS Queue Administrator

position and replaced by Eric Anderson who, at age 31, was some thirty years younger.

While Defendant argues that this was not a "demotion", Plaintiff testified credibly that it was

in fact a demotion, involving lost prestige as he was no longer "the cop on the block."

(Kuhn Depo. at 190-91).  Although Defendant argues that Plaintiff's removal from the

ICMS Queue Administrator position was not an adverse employment action because he

continued to receive the same salary and benefits, courts have repeatedly held that

26

such adverse actions do not need to be pecuniary in nature, but may be evidenced by a change in job duties.  "[I]t is well established in this Circuit that a plaintiff need not suffer a change of job title, a decline in income, or a reduction of benefits in order to establish an adverse job action." Curran v. All Waste Systems, 213 F.3d 625 (2nd Cir. 2000). Rather, an adverse employment action could be a "less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices…unique to a particular situation." Galabya v. New York City Bd. Of Educ., 202 F.3d 636, 640 (2nd Cir 2000).  In Curran, the court found that the fact that plaintiff was "made to perform a significant amount of helper work whereas before he had done almost exclusively driver work, he was deprived of seniority, he was taken off his prior Poughkeepsie route, and he was subjected to routine taunting by Genova for having brought his initial ADA suit" was sufficient to constitute a materially adverse charge sufficient to establish a prima facie case. Curran, 213 F.3d 625 (2nd Cir. 2000).  In this case, Plaintiff was not only removed from his Queue Administrator position, but assigned the menial task of disassembling computers in the back room, assigned less favorable hours, threatened with termination, denied open positions for which he was qualified, otherwise discriminated and retaliated against and ultimately terminated.

Moreover, Plaintiff was not told at the time that the change resulted from any perceived performance deficiencies on his part, but merely that Chavez wanted Anderson to implement the new procedures that were coming down.  Indeed, to this date, the record is devoid of any documentary evidence that Plaintiff was ever notified of any perceived

27

performance issues prior to his termination. Following Eric Anderson, the ICMS Queue

Administrator position was held by a number of other individuals, all of whom were

substantially younger and less experienced than Plaintiff and, being under the age of 40,

outside of the protected class. "Generally, a plaintiff's replacement by a substantially

younger person is evidence of age discrimination. See, O'Connor v. Consolidated Coin

Caterers Corp., 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996)." Carlton at

*134. See also, Stratton v. Dept. for the Aging, 132 F.3d 869, 879-880 (2d Cir.

1997)(inference of discrimination found where plaintiff's job duties taken over by

employees 13 and 26 years younger than plaintiff); Viola v. Philips Medical Systems of

N.Am., 42 F.3d 712, 716-717 (2d Cir. 1994)(an inference of discrimination sufficient to

support prima facie case found where plaintiff's position was filled by newly hired

younger employee within one year of the date of plaintiff's termination); Montana v. First

Federal Sav. & Loan Ass'n., 869 F.2d 100, 105 (2d Cir. 1989).

        In addition, there is evidence that other older employees, particularly those who,

like Plaintiff, transitioned to CSC from Sikorsky, voiced complaints about unfair,

discriminatory and harassing treatment by CSC managers, including Chavez. (Ex. 2 at

206-209, Ex. 3 at 153-158). There is ample evidence that Chavez's management style

was not only unprofessional, but unlawful, harassing, discriminatory and retaliatory

towards Plaintiff and others.

        Plaintiff's claim that Defendant hired younger employees at the expense of its

older and more experienced workers is borne out by the factual record. According to

the documents produced by the Defendant through discovery, 30 individuals were

involuntarily terminated by CSC at its Sikorsky business unit between January 1, 2000

and January 10, 2003.  The average age of those individuals is 43.83.  By contrast, the

average age of the 47 individuals hired into the Sikorsky business unit by CSC,

excluding those transferred from UTC, is 36.81, a difference of over seven years.  (Ex. 5

at CSC0419-34.)  This supports Plaintiff's observation that Defendant was bringing in

younger employees at the same time that older and more experienced employees like

Plaintiff were being laid off due to purported reductions-in-force.  Of the 17 individuals

reporting directly to Chavez on March 30, 2001, 11 had been hired after May 15, 2000

when Chavez was hired and assumed responsibility for the department (Biscoglio,

Firpe, Frankiewicz, Lovell, Ninno, Palumbo, Seese, Herd, Anderson and Iacoviello),

their average age being 33.82.  Id.  Of course, Chavez himself was hired on May 15,

2000, at the age of 32, to manage the department despite his limited experience and

complete lack of management experience.  Chavez, who replaced the fifty year old Glen

Gordon, thereafter hired the 31 year old Eric Anderson and chose him to replace

Plaintiff as ICMS Queue Administrator.  It was also the 32 year old Chavez who

recommended the two oldest of his direct reports, Kuhn and Walker, be reduced out.

a.    Plaintiff Has Established A Prima Facie Case Of Age Discrimination.

Defendant concedes that Plaintiff has satisfied three of the four prongs of the

McDonnell-Douglas prima facie case in that he was over 40, suffered adverse

employment actions, and that those adverse employment actions occurred under

29

circumstances giving rise to an inference of discrimination (Def. Memo at 19).

Unbelievably, despite his twenty two plus years of experience, Defendant challenges

Plaintiff's ability to establish the third prong, that he was qualified for his job.  Moreover,

Defendant seems to limit its challenge to Kuhn's qualifications to perform the duties of

Queue Administrator, a position he performed only a small portion of his day, from 6:30

a.m. to 9:00 a.m., during the several months leading up to his termination, completely

ignoring Plaintiff's longstanding record of superior performance as a technician.

    The burden that a plaintiff has in establishing a prima facie case is not a heavy

one, in fact it is minimal.  See, e.g., Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2nd

Cir. 2001).  The Second Circuit has repeatedly emphasized that the third prong deals

with minimum qualifications, not performance standards.  See, e.g., Powell v. Syracuse

University, 580 F.2d 1150 (2nd Cir. 1978) (plaintiff need only show that "she possesses

the basic skills necessary for performance of her job."); Visco v. Community Health

Plan, 957 F.Supp. 381, 386 (N.D.N.Y 1997) ("Thus, on occasions when this Circuit has

addressed the issue of the second prong, it has long and unequivocally held that a

plaintiff need only show that she is qualified for the position.").  This, even if Defendant's

laundry list of performance issues it attributes to Plaintiff had any actual basis in reality,

which Plaintiff vehemently disputes, Plaintiff would nonetheless have established a

prima facie case of discrimination.  Given the fact that Plaintiff received a positive

performance review in May of 2000, encompassing his duties as both Queue

Administrator and as a technician (Ex. 5 at CSC0032-38), and that Chavez himself

30

admitted in writing that Kuhn was performing well as a Queue Administrator on October 11, 2000 and that CSC "could not afford to lose [his] skills in the PC Supp[ort] role (Ex. 5 at CSC 0067), Defendant's argument is entirely unavailing.  Moreover, Chavez himself concedes that there were no plans to terminate Plaintiff but for the RIF.  (Ex. 3 at 208).

It is undisputed that Mr. Kuhn never received a formal warning or other notice of his alleged performance issues.  In fact, Plaintiff was never informed or warned that his performance was viewed as unsatisfactory during the entirety of his employment with CSC.  It was not until June 2001, more than three months after his termination, that Plaintiff was presented with the performance appraisal upon which Defendant now seeks to rely.  While Defendant claims that Chavez completed this evaluation in January 2001, that claim is dubious at best.  In addition to the fact that the evaluation was never presented to Plaintiff prior to his termination, the other employees supervised by Chavez only received their evaluations in June of 2001.  (Ex. 3 at 213).  Moreover, the evaluation itself states that it covers the period through March 30, 2001, which is consistent with CSC's policy of performing evaluations following the close of its fiscal year.  Indeed, Plaintiff received his previous (and positive) evaluation from CSC in May of 2000.  In addition to the inherent difficulties of evaluating an individual's performance months in advance, the fact that this evaluation was not produced until after Mr. Kuhn had filed his second administrative charge of discrimination and retaliation amply supports an inference that this alleged negative performance evaluation is entirely

pretextual, and created solely to support Defendant's opposition to Plaintiff's claims.  In
a similar case, the First Circuit held that an employer's production of a document
alleging an employee's incompetence after it had learned of that employee's intention to
sue was consistent with a finding that "Nalco orchestrated the Personnel Regeneration
Form as pretextual support for its age based decision to discharge Walton." Walton v.
Nalco Chemical Company, 2001 WL 1471729 (1st Cir 2001).  In Carlton v Mystic
Transp. Inc., the Second Circuit held that the fact that "during his employment with
Mystic, Carlton never received a negative written or formal warning, nor is there any
writing whatsoever criticizing his job performance" indicated that the company's
proffered reason for termination, performance, "was an afterthought." Carlton, 202 F.3d
129, 132 (2nd Cir. 2000).  In this case, whether Plaintiff and Jerry Walker were
eliminated because they were the poorest performers or rather because, at age 61 and
58 respectively, they were by far the oldest individuals reporting to Chavez at the time,
is a genuine issue of material fact that should be decided by the trier after a full hearing
of all the evidence.

        While Defendant's claim that "Plaintiff was 61 years old at the time CSC hired
him and 63 years old at the time of his layoff" (Def. Memo at 2) is true on its face, a
closer look at the surrounding facts and circumstances is necessary to put these facts in
their proper context.  Plaintiff was not "hired" by CSC as that term is normally
understood.  Plaintiff became an employee of CSC on January 1, 2000 along with other
Sikorsky employees who were then working in its IT Department, as well as other

employees of UTC at other sites as part of UTC's decision to outsource these functions to CSC. Thus, CSC did not exercise discretion in hiring Plaintiff and others, his employment transferred as a result of an agreement between UTC and CSC. Thus, any "same actor" inference would be entirely inappropriate in the present case. Moreover, while Defendant refers to Plaintiff's "brief employment" with CSC, in fact, Plaintiff's 9½ years of service at Sikorsky transferred with him to CSC. As a result, for purposes of this Motion, Plaintiff must be viewed as an employee with over ten years of service and a documented record of outstanding performance. Moreover, pursuant to the agreement between CSC and UTC, Plaintiff's employment was guaranteed for one year and Defendant could not have terminated Plaintiff's employment prior to January 1, 2001. Thus, Defendant was stuck with Plaintiff and the other older employees it inherited from Sikorsky. When Plaintiff did not take the hint and leave voluntarily in the face of the discriminatory, harassing and retaliatory treatment he received from Defendant, they terminated him under the guise of a RIF on March 30, 2001, within three months after his contractually guaranteed employment expired.

b.    There Is Ample Evidence To Support An Inference Of Age Discrimination

As stated above, Plaintiff has made out a prima facie case of age discrimination. Indeed, Defendant concedes, at least for the purpose of this motion, that there is sufficient evidence that the adverse employment actions Plaintiff suffered occurred under circumstances which support an inference of age discrimination. Plaintiff will similarly concede that Defendant has **articulated** a legitimate nondiscriminatory reason,

i.e., RIF and poor performance. While Defendant is correct that the burden then returns to Plaintiff to prove that age was a motivating factor, the Supreme Court has recently reaffirmed that the same evidence which supports a plaintiff's prima facie case may be sufficient to meet this ultimate burden as well.[6] This is particularly true where, as here, Defendant relies on a subjective evaluation of Plaintiff's performance which is belied not only by a 22 year plus record of solid performance, but a positive evaluation performed by **Defendant** itself just eight months prior to the negative evaluation on which Defendant now seeks to rely. Moreover, the decision maker himself, Fred Chavez, admitted in October, less than six months prior to the RIF, that Plaintiff was doing a good job and that the company could not afford to lose his PC support skills. The Second Circuit has repeatedly cautioned against placing undue weight on an employer's proffered explanation in deciding a summary judgment motion.

> "We further note that the district court seems to have attached undue significance to First Federal's claim that it merely exercised a good faith business judgment in terminating Montana … where, as here, the Plaintiff claims not that her employer used poor business judgment in discharging her but that her employer used the structural reorganization as a cover for discriminatory action, a federal court, to ensure that the business decision was not discriminatory, is not forbidden to look behind the employer's claim that it merely exercised a business decision in good faith … To hold otherwise would effectively insulate an employer from the constraints of federal anti-discrimination laws during any structural reorganization or reduction in force."

Montana v. First Federal S&L of Rochester, 869 F.2d 100, 106 (2nd Cir. 1989).

---

[6] Plaintiff notes that it is not his burden to prove that the entire RIF was discriminatory, merely Plaintiff's selection. This is especially so where, as here, it is clear that "the pertinent decision was a choice of which person to lay off and not simply which job to eliminate". Burger v. New York Inst. Of Technology, 94 F.3d 830, 834 (2nd Cir. 1996).

This is especially so when Defendant's explanation is based entirely on the undocumented and entirely subjective opinion of Plaintiff's performance purportedly held by Fred Chavez. Whether it was Plaintiff's performance which led to his removal from the ICMS Queue Administrator position and ultimate termination, or whether it was Plaintiff's age which motivated those decisions is a genuine issue of material fact for the jury to decide.

It is precisely because such credibility determinations are best made after a full hearing of all the facts at trial that the Supreme Court has warned that in deciding a summary judgment motion a trial court must disregard the favorable evidence to the moving party that the jury is not required to believe, and should give credence to the evidence of the non-movant and only so much of the "…evidence supporting the moving party that is **uncontradicted** and **unimpeached**, at least to the extent that the evidence comes from **disinterested** witnesses." Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2110 (2000)(emphasis added). Defendant relies almost entirely on Fred Chavez to support its claims of poor performance, claims which are contradicted by Plaintiff and others, including CSC's own formal performance evaluation conducted in May 2000, as well as Chavez's own admission that Plaintiff was "doing a good job" as Problem Resolution Queue Coordinator in October 2000. (Ex. 5 at CSC0067). Defendant's "evidence" is entirely unavailing. It seeks to rely on a performance evaluation purportedly done in January 2001 which was admittedly never presented to Plaintiff prior to his termination on March 30, 2001, and a numerical ranking of Chavez's

35

direct reports which Defendant has been unable to produce.  In addition to his statements being both contradicted and impeached, Chavez is anything but a disinterested party, being the individual who Plaintiff directly accused of age discrimination as early as August 2000, and who directly threatened and retaliated against Plaintiff as a result.  Plaintiff urges that Chavez's statements should be given no credence and must not be relied upon, as a matter of law, in deciding the instant motion.  As such, Plaintiff has met his burden of presenting sufficient evidence which a jury could reasonably infer that Defendant's reliance on purported performance issues is pretextual and Plaintiff's age was at least a motivating factor in the decision to demote Plaintiff from the Queue Administrator position and replace him with the thirty one year old Eric Anderson and to ultimately terminate him.

Defendant concedes that replacement by a younger employee is sufficient evidence of age discrimination.  There is no question that Mr. Kuhn was replaced by Eric Anderson as Queue Administrator in July 2000.  At the time, Plaintiff was never told the decision had anything to do with his performance, even when he inquired whether his age had anything to do with the decision.  Defendant also concedes that Plaintiff can meet his ultimate burden "by showing more favorable treatment of employees not in the protected group."  (Defendant's Memo at 25.)  In this case, it is undisputed that Mr. Kuhn was the oldest of the 17 individuals reporting directly to Mr. Chavez.  Moreover, the second oldest, Jerry Walker, was also rated a poor performer and terminated as part of the RIF.  Thus, 15 younger employees were treated far more favorably than

Plaintiff and Mr. Walker, in that they were not selected for the RIF and were able to maintain their employment.  Plaintiff urges that this evidence is, in and of itself, sufficient to warrant denial of the instant motion.

In addition, however, Defendant concedes that it hired the thirty three year old Todd Lovejoy in January 2001.  While Defendant claims this was "**months** before CSC initiated a workforce redirection", in fact it was just a little more than two months before the RIF was **completed**.  Moreover, Defendant admittedly hired individuals significantly younger than Plaintiff to fill the Asset Management positions for which he applied.  (Def. Memo at 24, fn 9.)  Nor does the fact that David Bennett and Monica Mancini were also in the protected class negate an inference of age discrimination.  The Second Circuit has held that replacement by individuals who are significantly younger than Plaintiff is sufficient evidence of age discrimination regardless of the fact that the younger individuals were also in the protected class.  In this case, Bennett and Mancini were ten and eighteen years younger than Mr. Kuhn respectively, an age difference more than sufficient to support an adverse inference.

In addition, just days after the purported RIF, Defendant was advertising for individuals to replace both Plaintiff and Mr. Walker.  While Defendant argues that these positions were never filled, Plaintiff would ask the Court to note that these job postings were presented to the CHRO in April 2001 and Defendant would have been well aware of the potential for liability had these positions been filled.  The fact that CSC continued to advertise for and hire younger employees before, during and after the purported RIF

37

undermines Defendant's explanations.  Hiring employees to replace an employee

allegedly laid-off during a RIF is evidence that the discharge occurred in circumstances

leading to an inference of discrimination.  See, e.g., Oxman v. WLS-TV, 846 F.2d 448,

453 (7th Cir. 1988)("Unlike the typical discharge case, an employer who terminates

employees pursuant to a [reduction-in-force] rarely replaces the employees it let go").

In Carlton, an employee 25 years younger than the plaintiff was hired to replace the

plaintiff only three months after the plaintiff was let go allegedly due to a reduction-in-

force.  The court held that these facts demonstrated that "perhaps some other motive—

beyond the company's finances—motivated Carlton's dismissal".  Carlton, 202 F.3d

129, 136.    "The decision to hire replacement employees following a general reduction

in the work force may, in conjunction with other evidence, establish an inference of

improper motive."  Viola v. Philips Medical Syst. Of North America, 42 F.3d 712, 718

(2nd Cir. 1994).  The fact that Defendant hired younger individuals from outside the

company, before, during and after the RIF, who admittedly lacked Plaintiff's experience,

skills, customer and product knowledge, seriously undermines Defendant's reliance on

"business reasons":

> "...the jury's implicit finding that defendants could have retained Stratton in
> some capacity at DFTA notwithstanding the budget crisis is supported by
> the record...  There simply was no plausible reason why DFTA would cast
> aside and mistreat a 21 year veteran in the manner that the jury found that
> it did or why DFTA would refuse to meaningfully consider her for new
> positions for which she was qualified and available."

<u>Stratton v. Dept. for the Aging of the City of New York</u>, 132 F.3d 869, 880 (2nd Cir.

1997).  In this case, Defendant's own records indicate that at the very time it was

terminating Plaintiff as a result of a purported RIF, CSC was planning to retain

contractors to convert to employees to fill **open positions** "when the dust settles" (Ex. 5

at CSC0609).

      The fact that Defendant failed to follow its own published policies and procedures

further undermines its proffered explanation.  For example, Defendant failed to follow its

own policy when it failed to take into account the length of service of Plaintiff, Jerald

Walker and others.  According to Section 1.1 of "CSC Human Resources Manual Policy

213 – Layoff" an employee's "length of service with CSC" was supposed to be

considered as part of a layoff.  Moreover, Section 4.1.1 goes on to say that when two

employees "possess equal skills, knowledge, ability, reliability and substantially similar

performance records, the person with the least length of service shall be laid off first."

(Ex. 5 at CSC0184-190.)  According to CSC policy, selection for layoff "shall be based

on a combination of factors which will include but not necessarily be limited to CSC

needs and employee skills, knowledge, ability, reliability, performance and length of

service with CSC."  (Ex. 5 at CSC0184).  These standards were never communicated to

Chavez.  By his own admission, he was simply asked to rank the performance of his

direct reports numerically.  Admittedly, Chavez never considered factors such as length

of service because he was never asked.  (Ex. 3 at 179, 185, 191.)  Defendant's claim

that "Plaintiff's selection for layoff was the result of careful consideration by

39

management" (Def. Memo at 12, 22) is belied by the facts.  According to Defendant, Mary Elomaa relied upon Chavez's recommendation, "because she did not directly oversee Kuhn or other layoff candidates."  Id.  "Based on Chavez's assessment, Kuhn was among those selected for layoff".  Id. at 13.  Thus, the "careful consideration by management" amounts to nothing more than a numerical ranking of the performance of his direct reports by Fred Chavez, who was not informed of the criteria to be followed, and who had previously been accused of age discrimination by Mr. Kuhn.  (Ex. 3 at 179, 185, 191.)

    Jerry Walker was one of 9 individuals reportedly rated as a "3" by Chavez.  No mention is made of any comparison of length of service between Walker and these other employees who received a "substantially similar" rating of "good", let alone an analysis of their respective "skills, knowledge and ability."  Moreover, no explanation is offered as to why none of the four contractors rated by Chavez as a "4" were selected instead of Plaintiff, despite Chavez' testimony that "I think the general understanding, at least the unspoken understanding I have is that we try to keep as many actual CSC employees as possible before keeping contractors."  (Ex. 3 at 201).  Nor is any explanation offered as to why one of these contractors, the 27 year old Dennis Willis, not only survived the RIF, but was hired by CSC as an employee just seven months later.  (Ex. 5 at CSC0631, 0433).  Of course, Plaintiff will argue, and a juror could reasonably infer, that the performance reviews were drafted to achieve the desired result, the oldest members of the department being selected for layoff.

40

Defendant has asserted that Jerald Walker's date of birth is June 1, 1960 throughout the administrative process and even in responding to discovery in this case. (See, e.g., CSC0436)  This is incorrect.  Mr. Kuhn testified at his deposition that shortly after the RIF on March 30, 2001, he telephoned Mr. Walker at his home and was informed that Mr. Walker's date of birth was December 22, 1942, as Defendant now concedes, making him 58 years of age at the time of the RIF.  Mr. Kuhn informed Defendant of this during the CHRO investigation.  Thus, Fred Chavez ranked the two oldest individuals reporting to him as the worst performers.  Defendant also claims that Lisa Cook (d.o.b. 7/7/73, age 28) was part of the RIF on March 30, 2001.  This, however, is contradicted by Defendant's own documents, which show that Ms. Cook was actually terminated on March 19, 2001, in advance of the RIF (CSC0610). Moreover, Ms. Cook admittedly was not working in Stratford, nor even Connecticut, but Alabama.  Thus, the Reduction in Force resulted in the elimination of three employees, Richard Kuhn (age 62), Jerald Walker (age 59) and Peter Vandeman (age 53), all over the age of 53 and all, obviously, in the protected class under the ADEA.  Defendant's errors with regard to the information it provided during both the administrative process and in the instant action is disturbing, as Plaintiff lacks the ability to confirm that the balance of the information provided by Defendant is accurate.

Moreover, while Fred Chavez indicated that it was his understanding that employees were to be favored over contractors in the RIF, the opposite actually occurred.  While at least four contractors were rated a "4" for performance, and at least

41

two others rated a "3", none of these contractors were victims of the RIF on March 31,

2001.  (Ex. 5 at CSC0436, 0631).  Moreover, Chavez testified that several of these

contractors were converted to CSC employees shortly prior to or following the RIF. (Ex.

3 at 202-03).  Finally, while Peter Vandeman is listed as being terminated in the RIF, his

name is notably absent from all documents relating to the RIF produced by Defendant

(see, e.g., CSC0609-610, 631).  One is left to guess as to why Peter Vandeman was

selected, other than the fact that he was 53 years old at the time.

3.    PLAINTIFF HAS AMPLE EVIDENCE THAT CSC RETALIATED AGAINST HIM
      FOR OPPOSING DISCRIMINATORY PRACTICES.

      In order to make out a prima facie case of retaliation a plaintiff must show that

"(1) he was engaged in a protected activity under…the ADEA; (2) the employer was

aware of the plaintiff's participation in the protected activity; (3) he was subjected to an

adverse employment action, and (4) there is a causal connection between the protected

activity and the adverse action."  Vernon v. The Port Authority of New York & New

Jersey, 154 F. Supp. 2d. 844, 858 (S.D.N.Y. 2001).  Defendant apparently concedes

the first three prongs, as well it should given that there is no question that Plaintiff easily

meets them.  Kuhn admittedly complained internally of his unfair treatment and his

belief that it resulted from age discrimination; and filed a formal charge of discrimination

with the CHRO and EEOC on or about August 24, 2000.  Defendant was admittedly well

aware of these protected activities and Plaintiff was thereafter threatened, harassed,

had his hours and responsibilities changed, was denied other positions for which he

42

was qualified and was ultimately terminated on March 30, 2001.  Defendant bases its

motion for summary judgment solely on its argument that there is insufficient evidence

of a causal connection between Plaintiff's protected activities and the adverse actions

he suffered to warrant a trial.  Unfortunately for Defendant, this argument is entirely

unavailing.

Defendant argues that the temporal proximity between these events is

insufficient to support an inference of retaliation.  However, in this case, Defendant

could not have terminated Plaintiff prior to January 1, 2001, pursuant to its contract with

UTC.  Thus, Plaintiff was terminated within three months of the time Defendant was first

able to do so.  Moreover, while Plaintiff's administrative charge is dated August 24,

2000, Defendant did not receive it until some time later.  Moreover, if Chavez's

testimony is credited, he filled out the performance evaluation which led to Plaintiff's

termination in January of 2001, shortly after he first learned of Plaintiff's administrative

filing.  In addition, Plaintiff was denied available positions for which he was qualified and

for which he had applied in the days and weeks immediately preceding, and even

following, his termination.  Moreover, the Vernon court, after stating that "Proof of causal

connection can be established indirectly by showing that the protected activity was

followed closely by discriminatory treatment" expressly found that a period of four

months was sufficient to support a causal connection.  Id.

In addition, Plaintiff does not rely on the temporal connection alone.  Defendant's

own records support an inference that Plaintiff's protected activities played a part in his

43

selection for termination.  As part of the RIF process, Plaintiff and Jerald Walker were noted to have human resources issues, Plaintiff's previous age discrimination complaints and Mr. Walker's issues with disabling health conditions.  Remarkably, the only two individuals with noted complaints were the two individuals selected for the RIF.  Like the fact that they were the two oldest members of the department, Defendant seeks to pass this off as a coincidence.  The Second Circuit, however, recently reversed a district court's decision to grant summary judgment where plaintiff introduced documents with unexplained notes saying "EEOC action" and "Pending complaints".  Terry v. Ashcroft, 336 F.3d 128 (2nd Cir. 2003).  In rejecting the lower court's conclusion that the employer had established a legitimate, non-discriminatory reason in that others were better qualified, the court held that the above notations created a genuine issue of material fact regarding pretext and, in addition, plaintiff presented evidence that the other candidates were not, in fact, better qualified.  As was the case in Terry, the evidence presented in this case demonstrates that the only two individuals with noted concerns were terminated, and that there is ample evidence undermining Defendant's reliance on their purported performance deficiencies.  Taken as a whole, there is more than sufficient to support an inference of unlawful retaliation.

Plaintiff has ample additional evidence as well.  Chavez, the decision maker, directly threatened Kuhn that he could be terminated if he continued to complain about his discriminatory treatment. (Ex. 2 at 113-15).  Moreover, there is ample evidence of Chavez's retaliatory tendencies.  For example, after learning that individuals had

44

participated in a confidential focus group at which they criticized CSC's managers, Chavez and his supervisor, Rob Gaynor, went through the department asking people who had attended the meeting. (Ex. 1). Moreover, in addition to being removed as ICMS Queue Administrator, Kuhn was assigned to physically take apart computer equipment in the back room and carry it out to the dumpster, not only a demotion from the Queue Administrator position but well below the duties performed by other technicians. (Ex. 2 at 30-31). Chavez's comments that "I feel like firing someone today" also support an inference that his decision was influenced by an improper discriminatory animus, as does the warning Kuhn received from his co-worker, Dave Defeo to "watch your back." Taken as a whole, there is more than ample evidence to support an inference that Kuhn's opposition to perceived discriminatory conduct by Defendant was at least a motivating factor in Defendant's decision to terminate his employment on March 30, 2001, as well as the various other adverse employment actions Plaintiff endured following his initial complaint of age discrimination.

## CONCLUSION:

WHEREFORE, for the foregoing reasons, Defendant's Motion for Summary Judgment should be denied in its entirety.

THE PLAINTIFF


BY_____
              Francis D. Burke
              MANGINES & BURKE, LLC
              1115 Main Street, Suite 708
              Bridgeport, CT  06604
              (203) 336-0887
              Fed. Bar No. ct18688


## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, via U.S. Mail,

postage prepaid, this 26th day of October 2004, to:


Eric Sussman, Esq.
Day, Berry & Howard
One CityPlace I
Hartford, CT  06103-3499


                              _____
                              Francis D. Burke

46