UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RICHARD KUHN,
        Plaintiff

v.                               3:02-CV-363 (EBB)

COMPUTER SCIENCE CORPORATION
        Defendant

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.  The Standard of Review

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See also* Anderson v. Liberty Lobby, 477 U.S. 242, 256 (1986)(plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. However, "[i]f, as to the issue on which summary judgment is sought, there

is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party. . . ." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d. 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965 (1992); Heilweil v. Mt. Sinai Hospital, 32 F.3d 718, 721 (2d Cir. 1994). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255, *quoted in* Keeney v. City of New London, 196 F.Supp.2d 190, 195 (D.Conn. 2002).

"[T]he requirement is that there be no *genuine* issue of *material* fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48 (emphasis in original). When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

**STATEMENT OF FACTS**

The Court sets forth only those relevant facts deemed

2

necessary to an understanding of the issues raised in, and the decision rendered on, this Motion. The facts are distilled from the Complaint, the parties' memoranda of law and exhibits thereto, and the parties Local Rule 56 Statements.[1]/

Plaintiff Richard Kuhn ("Plaintiff" or "Kuhn"), brings this Complaint, alleging age discrimination and retaliation based thereon in derogation of federal law, the Age Discrimination In Employment Act ("ADEA"), 29 U.S.C. § 623 et seq., and state law, the Connecticut Fair Employment Practices Act ("CFEPA") Conn.Gen.Stat. § 46a et seq.[2]/

At the time of his alleged demotion and, following, his termination by Defendant Computer Science Corporation ("CSC"), Kuhn was 61 and 62 years of age, respectively. Therefore, he belongs to the protected class of ADEA and CFEPA, as CFEPA has been analyzed by this Court.

Kuhn was hired by Sikorsky Aircraft Corporation in 1991. In this position, he was responsible for maintaining Sikorsky's computer equipment and installation. In January, 2000, CSC took over Sikorsky's Information Technology ("IT") department as an outsourcing operation. Kuhn was transferred to CSC as a Senior

---

[1]/ In footnote two of its Memorandum of Law, Defendant, for purposes of this Motion only, accepts as true the facts as Plaintiff has recited them in his Complaint and during discovery.

[2]/ Plaintiff also sets forth claims for overtime compensation, which Defendant is not moving against in the present Motion. Plaintiff has withdrawn Count 8, which claimed breach of the covenant of good faith and fair dealing. Therefore, that part of the Motion is denied, as moot.

PC Technician in CSC's PC Support Group. He was promoted to the position of an ICMS Queue Administrator in or about March, 2000, by his then-supervisor, Frank Villa. Plaintiff readily accepted this promotion. Although his salary was not increased, he asserts that his responsibilities and prestige within CSC did.

The ISMS Queue Administrator is responsible for tracking performance and escalating the flow of orders through the Client Order Fulfillment and ICMS process. He also monitors the calls which come into the help-desk and assigns them to the proper technicians in their group. CSC personnel would then issue a "ticket" describing the problem and, if they were unable to alleviate the problem by telephone, they would transfer the ticket to Kuhn, as Queue Administrator. An additional responsibility was updating the status of each ticket and ensuring that the work on all tickets was completed by the Desktop Technicians. Yet another responsibility was to collect Property Work Order Forms ("PWO"), which forms were required to be filled out by the Desktop Technicians, and contained information about the work they had performed. Next, Plaintiff also was required to ensure the accuracy and completeness of the PWOs, complete information if necessary, and send them to the "back office", in order that the records be maintained.

In May, 2000, Plaintiff received an exemplary performance review from Supervisor Villa. Out of 17 categories, Plaintiff was rated "Good: meets expectations" in 12 of the categories, and "Very Good: exceeds expectations" in four other categories. He

4

received just 1 category noted as "Needs Improvement." He received a merit raise based on this review.

On or about May 11, 2000, 32 year-old Fred Chavez ("Chavez") was hired by CSC and soon thereafter replaced 50 year-old Glen Gordon as the manager of Plaintiff's department. According to Chavez, one month[3]/ following Plaintiff's highly positive review, he allegedly started to notice performance problems in Plaintiff's work because the "back office" was sending PWO's back to Plaintiff for completion. Defendant asserts "[t]hus, plaintiff's inattentiveness to detail and the incompleteness of his work became apparent shortly after Chavez became Desktop Manager." Yet, Chavez never spoke to Plaintiff about these sudden faults.

In July, 2000, while Plaintiff was on vacation, Chavez placed Eric Anderson, then 31 years of age, into Plaintiff's position. Upon Plaintiff's return, Anderson advised Plaintiff that he had been demoted while on vacation, and that Anderson was taking over Plaintiff's duties as ICMS Queue Administrator. Kuhn had had no advance notice of this demotion and, in fact, following the demotion, was placed into a job level which was even lower than his original position when hired at CSC. When this was inquired into by Plaintiff, Chavez verified that the job was no longer his. Again, there was no mention of any

---

[3] Kuhn alleges that, if Chavez "saw" anything, it wasn't for 2½ months following the review. Chavez, nevertheless, conceded that he said nothing to Kuhn with regard to any alleged problems with Kuhn's work.

5

performance issues with Plaintiff's work. When directly asked by Kuhn, Chavez denied that Kuhn's age had anything to do with this demotion.

On or about August 16, 2000, Plaintiff met with Chavez, Chavez' supervisor and several other people, following a letter of concerns sent by Plaintiff to Carl Bishopric, a Human Resources Manager, including a concern of age discrimination. As a result of this meeting, Plaintiff was promised help with the Queue Administrator position and, accordingly, was reassigned to that position, effective August 21.

On August 25, 2000, Kuhn attended a focus group, called by Bishopric. Eight of the ten attendees were over the age of 40. These ten former Sikorsky workers explained to Bishopric how they were mistreated, harassed, and intimidated by CSC managers. Plaintiff testified, and averred in an affidavit, that, after the meeting, Bishopric stated that he had "heard some disturbing things today." Within a very short period of time, Chavez and his supervisor were attempting to find out just exactly who had attended the meeting.

On August 28, just four days after the focus meeting and one week after he had been given the Queue Administrator position back, Chavez again demoted Kuhn and, again, told him that he was not allowed to continue in that job.

On September 6, 2000, Plaintiff met with Chavez and Chavez' manager, Talitha Brown. During this meeting, Kuhn advised Chavez that he believed that he was being discriminated against by

6

management because of his age.

On September 18, 2000, Plaintiff filed a dual charge of discrimination with the EEOC and the CHRO, based on his unlawful demotion from the ICMS Queue Administrator position. In an apparent settlement, Plaintiff was allowed to assume the role of ICMS Queue Administrator, from 6:30 a.m. until 9:00 a.m., after which he spent the rest of his day performing the duties of a Senior PC Technician, the job to which he had been originally assigned when hired by CSC. Shortly afterwards, however, Chavez informed Kuhn that there were new processes and procedures handed down from the corporate offices for being a Queue Administrator and that he wanted, not Kuhn, but 31 year-old Anderson to implement them. However, Chavez never explained to Kuhn exactly what these new processes and procedures were, nor did he ever offer to provide Kuhn with any training in them. Rather, for the third time, he again demoted Kuhn in favor of the thirty-year younger Anderson.

On October 11, 2002, Chavez sent Kuhn an e-mail expressly acknowledging that he was doing a good job and "we cannot afford to lose your skills in the PC Supp[ort] role." He wrote further that the number of backlogged tickets should decrease with "the addition of three new technicians." Based on this, a reasonable jury could find that it was not Kuhn who was responsible for this backlog, but, rather, inadequate staffing and the "chaos" existing in the department at that time.

In his deposition, Chavez conceded that, at no time prior to

7

Plaintiff's termination, was Plaintiff ever advised that his work performance was less than satisfactory. In fact he testified that the whole department was in "chaos" during the relevant time period, and it took a new account, such as Sikorsky, up to three years to mature. Further, Chavez conceded that he had received numerous complaints about workers other than Kuhn, but that he neither looked for nor produced the documents showing similar issues involving these other employees.

In early 2001, Kuhn applied for other positions at CSC, including that of an Asset Management position and a Queue Administrator position in two completely different departments than the one in which he was presently working. He was never given an interview and Kuhn contends that, although he was qualified for both positions, management's failure to even consider him was unlawful discrimination based on his age and was also retaliatory for his having engaged in the protected activity of filing a complaint with the CHRO and the EEOC.

On March 30, 2001, only six months after filing the first discrimination charge, Kuhn was terminated, which CSC alleges was due to a reduction-in-force ("RIF").[4] Chavez, and five other

---

2/ In defending Kuhn's termination, Defendant relies on a performance appraisal allegedly started by Chavez' in January, 2001. This document was never shown or given to Plaintiff, prior to the RIF, inasmuch as it was allegedly not completed before he was terminated. Defendant also emphasizes an unanswered question in the employee's section filled out by Kuhn, and inserted **before** the appraisal was allegedly completed by Chavez. It was not shown to Kuhn until three months following his termination, and he never was given an opportunity to respond to it. Chavez, in contrast to all of Kuhn's other managers, rated him as less than satisfactory. In the years proceeding Chavez' review, Kuhn consistently had been rated as "superior" and "fully

8

managers were responsible for ranking those who reported to them, on the "quality" of the employees' work. Chavez ranked Kuhn 17th out of 17.[5]/ Kuhn's colleague, 58 years of age, was ranked 16th. Among his reasons for Kuhn's ranking included "[h]e didn't have the technical skills to handle the more complex problems"; he "didn't show initiative"; and "[he] didn't seem interested in completing the work to the best of his ability." At the time of his review of Kuhn, Chavez had been his manager for less than one year. In contradistinction, Glen Gordon had supervised Kuhn for approximately 5-6 years, first at UTC and later at CSC. He avers that "Richard Kuhn was a very good employee. When you gave him something to do, you didn't have to worry about getting it done. Dick was very conscientious and he always gave it his all. Any allegation that Dick Kuhn's technical skills were deficient or out of date is nonsense. . . . `Dick Kuhn would certainly be ranked near the top in terms of performance, skills, attitude and experience among the technicians I supervised.'" Affidavit of Glen Gordon (November 17, 2004)

Kuhn filed a second complaint with the CHRO and EEOC a short time after his termination. Plaintiff alleged, as he does in his present Complaint, that this RIF discriminatorily singled him out on the basis of age, in derogation of ADEA and CFEPA, and that

---

competent."

[5]/ This ranking review "has been lost" by CSC. Therefore, any testimony about it would be inadmissible hearsay or would, at the least, call for an adverse inference instruction.

9

CSC retaliated against him because he had previously opposed discriminatory practices in the workplace.[6] For example, just two weeks after he was terminated, CSC posted two new positions which Plaintiff described as "remarkably similar, indeed virtually identical to the position[] from which . . . he [was] laid off." The average age of those who were allowed to remain in their jobs was 35.26 years of age, down from pre-RIF 38.18 years of age. Plaintiff presents several performance reviews of these substantially younger employees, which clearly provide highly negative comments, yet resulted in very high reviews.

As part of the RIF process, both Kuhn and his terminated colleague had specifically been identified by HR as having "issues." As to Kuhn, it was written that he had a "Pending Age Discrimination Suit"; as to his colleague, "Potential Age and Health Issues." Defendant asserts that these "issues" had nothing to do with both men being terminated.

## LEGAL ANALYSIS

II. **The Standard of Federal Rule of Civil Procedure 56 As Applied**
A. **Age Discrimination**

The Second Circuit plainly has set forth the required analysis to be followed by this Court in deciding this Motion. See Viola v. Phillips Medical Systems of North America, 42 F.3d 712, 715-16 (2d Cir. 1994). First, Plaintiff must present a

---

[6] The only other person terminated from Kuhn's department was 58 years of age.

*prima facie* case of age discrimination under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). This burden is "minimal". James v. New York Racing Association, 233 F.3d 149, 153 (2d Cir. 2000). Plaintiff must show: (1) that he was in the protected age group, (2) that he was qualified for the position, (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination. Woroski v. Nasua Corporation, 31 F.3d 105, 108 (2d Cir. 1994). The *prima facie* case "requires no evidence of discrimination." James, 233 F.3d at 153. "By making out this `minimal' *prima facie* case, even without evidence of discrimination, the plaintiff `creates a presumption that the employer unlawfully discriminated'." Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997)(en banc), cert. denied, 522 U.S. 1075 (1998)(internal citations omitted).

If the plaintiff makes a prima facie case, then, second, the burden of production is shifted to the employer to proffer a nondiscriminatory reason for its action. Should the employer succeed in meeting this burden, the presumption completely "drops out of the picture." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993). "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated . . . remains at all times with the plaintiff." *Id*. at 507, *quoting* Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). Finally, assuming a defendant meets this burden, the

11

balance of proof is returned to the plaintiff to demonstrate that the reasons proffered by the defendant are pretextual.

In the present case, Defendant concedes that Plaintiff has met his burden as to three of the four McDonnell Douglas requirements of a *prima facie* case. The only one challenged is prong two: whether he was qualified for the position.

Clearly, in meeting this prong of his *prima facie* case, Plaintiff has shown that "he possesses the basic skills necessary for the job." Powell v. Syracuse University 1150, 1154 (2d Cir.1978). The standard in this Circuit is **minimal qualifications**, not performance reviews. "To satisfy [this element] of the [McDonnell Douglas] test, the plaintiff need not establish that his performance was flawless or superior. Rather, he need only demonstrate that he `possesses the basic skills necessary for performance in [the] job.'" de la Cruz v. New York City Human Resources Administration, DDS, 82 F.3d 16, 20 (2d Cir. 1996) *quoting* Powell v. Syracuse University, 580 F.2d 1150, 1155 (2d Cir. 1978). *See also* Vernon v. Port Authority of New York and New Jersey, 154 F.Supp.844, 856 (S.D.N.Y. 2001)(plaintiff does not need to show perfect performance or even average performance, but only needs to show that he possesses the basic skills necessary for job.) After supervising Kuhn for 5-6 years, Glen Gordon, who was intimately familiar with Kuhn's qualifications, wrote an e-mail to CSC management, indicating his belief that Kuhn could perform a particular open placement, that of Cycle

12

Counting Analyst. The management-level Service Delivery Manager responded: "As for Dick Kuhn I did not add his name to the list as he was out on our RIF list. **I am not sure that bringing him back onto the Sikorsky account would be a good thing.**" Surely, this positive recommendation from a former supervisor, and the reasons cited in the concomitant response from a manager of Defendant, who did not even know Kuhn, is an example of just one quintessential factual dispute as to whether Kuhn was qualified for the job or was replaced for other business reasons. Thus the duty of solving contradictions, among many present in this case, must be left for the jury to decide. "Any assessments of credibility and all choices between available inferences are matters left for the fact finder, not matters to be decided by the Court on summary judgment." Azrielli v. Cohen Law Offices, 21 F.3d 512, 51 (2d Cir. 2d Cir. 1994). *See also* Fed.R.Civ.P. 56(e), 1963 Advisory Committee Note; Agosto v. I.N.S., 426 U.S. 748, 756 (1977).

Defendant argues that the Plaintiff cannot attest to the fact that his job performance was satisfactory, inasmuch as such testimony, found in his affidavit, is conclusory and self-serving. "There is nothing in the Rule [56] to suggest that nonmovants' affidavits alone cannot - - as a matter of law - - suffice to defend against a motion for summary judgment." Danzer

13

v. Norden Systems, Inc., 151 F.3d 50.57 (2d Cir. 1998).[7]/ Thus, after thorough review of Kuhn's affidavit, the Court will not negate it and will put as much emphasis as might be required on the averments therein.

Again, contrary to Defendant's assertion, this Court finds that, as to indirect proof of discrimination, Plaintiff has met his burden at this legal juncture. In <u>Stratton v. Department of Aging For The City of New York</u>, 132 F.3d 869, 879-80 (2d Cir. 1997), the Court held that an inference of discrimination was met by evidence that a 61-year-old employee was relieved of her job duties in favor of employees 13 and 26 years younger than the Plaintiff. In <u>Viola</u>, 42 F.3d at 716-17, the Court of Appeals held that an inference of discrimination was sufficient to support a *prima facie* case where the plaintiff's position was filled by a newly hired, younger employee within one year of his termination. In <u>O'Connor v. Consolidated Coin Caterers Corporation</u>, 517 U.S. 308, 313 (1996), the Supreme Court wrote, . . . "[T]he fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination . . . ."

Based on this mandatory precedent, with which this Court is in complete agreement, the Court holds that Plaintiff has succeeded in meeting the *prima facie* case of <u>McDonnell Douglas</u>

---

[7]/ This, of course, does not mean that the nonmoving party's affidavit may contain purely conclusory statements or is not based on the affiant's personal knowledge. That is not the problem herein.

14

and its progeny as to both his ADEA and CFEPA claims.[8]/ Summary judgment is DENIED as to this claim.

Having found that Plaintiff has met his *prima facie* burden, the Court turns to the second part of the analysis: whether Defendant has shown a non-discriminatory reason for terminating Kuhn. The Court finds that there are many genuine issues of fact in this regard and sets forth the following examples. First, the abundance of conflicting performance reviews; second, whether his department was understaffed during the pertinent time, negating the blame placed on Kuhn for the backlog of his work, as Chavez acknowledged that three additional technicians should help reduce said backlog; third, whether Chavez focused solely on Plaintiff's performance and ignored complaints about other employees under his supervision; fourth, why were so many much younger employees, with virtually no experience, kept on after the RIF when Plaintiff's experience, skills, and training were vastly superior and, yet, he was terminated; fifth, whether the HR's notation that Plaintiff had "a pending age discrimination suit" was an important element in his termination; sixth, whether Plaintiff, with twenty-odd years of experience, was more suited to the position than Anderson or the other individuals who next held the position, all of whom were substantially younger and under 40,

---

[8]/ As correctly stated by Defendant, this Court's analysis of Kuhn's ADEA claim applies equally to CFEPA. "The analytical model for proof of discrimination is the same for both statutes, and indeed federal precedent provides guidance for the application of state laws concerning employment discrimination." Levy v. Commission of Human Rights and Opportunities, 236 Conn. 96, 103 (1996).

15

thus, not members of the protected class; seventh, whether Plaintiff was terminated because he was the poorest performer or rather, at age 61, he was by far the oldest person reporting to Chavez; eighth, as raised by Defendant itself, who proclaims that it was Kuhn's poor performance that eventually led to his termination. However, the exhibits are replete with statements that Kuhn was never told of these alleged problems with performance. These are but limited examples unanswered as a matter of law.

Defendant argues that, "Plaintiff's selection for layoff was the result of careful consideration by management." However, a reasonable jury could find that it was Chavez who made the determination in his sole discretion and this decision was "rubber-stamped" up through the ranks of command. If one carefully considers Defendant's Memorandum of Law at pp. 12-13, the claim of careful consideration by management is completely rebuffed by the final sentence at the top of page 13: **"Based on Chavez' assessment**, Kuhn was among those selected for layoff."

"The question for the Court, therefore, is not whether CSC made the best employment decision, but whether it has advanced a legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiff." Defendant's Memorandum of Law at p. 24. Inasmuch as the Court has cited a substantial number of genuine issues of material fact regarding CSC's employment decision, this question must be determined by the jury.

16

Thus, summary judgment as to Plaintiff's age discrimination claims, pursuant to the ADEA and CFEPA, is inappropriate and is hereby DENIED.

### B. Retaliation

In order to set forth a *prima facie* case for retaliation under ADEA and CFEPA, the Plaintiff must show that: (1) he was engaged in a protected activity, (2) the employer was aware of the Plaintiff's participation in the protected activity, (3) he was subjected to an adverse employment action, and (4) there is a causal connection between the protected activity and the adverse action. Slattery v. Swiss Reinsurance American Corp., 248 F.3d 87, 94 (2d Cir. 2001). The burden at this stage is de minimus. Wannamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997). Once the Plaintiff has made his prima facie case, the Defendant must offer a legitimate, non-discriminatory reason for the adverse employment action. Slattery, 248 F.3d at 94-95. If the Defendant satisfies its burden, then the Plaintiff must show that the reason is a pretext for discrimination. *Id.* at 95.

It is beyond peradventure that Plaintiff has made his *prima facie* case for retaliation. First, he engaged in the protected activity of filing a claim with the CHRO and the EEOC on or about August 28, 2000. Second, CSC was well aware of this, in that they filed a lengthy response. Third, Plaintiff was subjected to the ultimate adverse employment action, in that he was terminated from employment, in a manner in which age discrimination could

17

potentially be found by a reasonable jury. Further, the Second Circuit has held that a downgrade in evaluation is also an adverse employment action. <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir. 1999).

Plaintiff has also made a *prima facie* case as to prong four, causation. Defendant apparently relies strictly on temporal proximity between Plaintiff's CHRO/EEOC complaint and the RIF, citing eight cases for this proposition. This is not controlling herein, in that Plaintiff was submitted to many adverse employment actions at the hands of CSC, first by behavior which resulted in his Complaint, and, second, the myriad of negative events following the Complaint. On August 15, 2000, Plaintiff attended a meeting called by an HR manager, reporting the difficulties he was having with Chavez, including three demotions, including an instruction to "go out back and get rid of non-functioning computers". In other words, be a janitor. However, as a result of this meeting, Kuhn was re-promoted to the position of Queue Administrator, for three hours per day.

On August 25, 2000, Plaintiff was called to a CSC focus meeting, consisting of 10 employees transferred from Sikorsky to CSC and an HR manager. The HR manager was "shocked by what he heard in the meeting" regarding mistreatment by CSC managers, and that "it would be taken care of." Just four days after attending this focus group, and one week following his re-promotion, Chavez informed Plaintiff that he was being demoted again. Initially, in October, 2000, Defendant began to hire new and younger employees,

18

several months prior to the RIF, yet none of these new hires, regardless of the negative comments written on each one's evaluation, were eliminated as part of the RIF rather than Kuhn, who had twenty-two years of experience in the field. Also in October, 2000, Chavez wrote to Kuhn the extremely complimentary e-mail, as noted above. Yet, just three months later, breaking with years of tradition, Chavez allegedly gave Kuhn a highly "unacceptable" evaluation, which he never showed to Kuhn.[9]/ Further, prior to the RIF, someone in HR specifically identified Kuhn as having the "issue" of a "Pending Age Discrimination suit." On March 19, 2001, a CSC Vice President, Henning Kerser, advised his managers that "if you have `problem cases' and HR has not worked with them, this is the time to do so. Get them on the list and put them at the top with a comment indicating the `problem' case and it will be taken care of." Again this directive to the supervisory managers is inferential evidence of age discrimination against Kuhn, as he was 61 or 62 when the HR note was included and the concomitant directive given by high management.

In January, 2000, Plaintiff was not even given an interview for two promotions for which he was qualified and was terminated before the search for the appropriate candidate commenced.

---

[9]/ Just as in this case, the Second Circuit, in examining the causation factor, noted that, "ordinarily, [Defendant's] employees have access to counseling and feedback on their evaluations. When asked [Plaintiff's] supervisors summarily refused to allow him to see it." Vernon, 154 F.Supp.2d at 855. Kuhn was not given his Performance Evaluation for months following the RIF, when he had no opportunity to rebut the negative review it contained.

Again, this is evidence of causation in an age discrimination case, as Plaintiff was 62 when he applied for these jobs.

These examples raise questions of fact as to whether there exists a causal connection between the negative acts and the RIF. Inasmuch as Defendant has chosen not to brief the issue as to whether it has proffered a legitimate, non-discriminatory reason for the alleged retaliation, which is its burden, the Court considers it waived and, again, summary judgment on the retaliation claim is hereby DENIED.

## CONCLUSION

For each of the reasons set forth herein, Defendant's Motion for Summary Judgment as to Counts One, Two, Four and Five [Doc. No. [31] shall be, and hereby is, DENIED. Doc. Number 31, as it applies to Count Eight, is hereby DENIED AS MOOT, inasmuch as Plaintiff has withdrawn that claim.

Jury selection of the trial in this matter shall be held on August 9, 2005. Should the parties wish to explore settlement of the matter with Honorable Magistrate Joan Glazer Margolis, they should contact this Court for the proper referral.

SO ORDERED

ELLEN BREE BURNS

SENIOR UNITED STATES DISTRICT JUDGE

Signed at New Haven, Connecticut, this 30 day of March, 2005.